[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 2, 2007
THOMAS K. KAHN
CLERK

_____

Nos. 05-11689 & 05-15014

_____

D. C. Docket No. 02-00171-CR-ORL-28KRS

UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross-Appellant,

versus

M. SALEEM KHANANI,
DAVID PORTLOCK,

Defendants-Appellants
Cross-Appellees.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(October 2, 2007)**

Before EDMONDSON, Chief Judge, and BIRCH and WILSON, Circuit Judges.

BIRCH, Circuit Judge:

M. Saleem Khanani and David Portlock appeal their convictions both arguing that the district court erred in refusing to give their "mere employment" theory of defense jury instruction and that the warrant searches conducted at Portlock's accounting business and storage facility and other locations violated the Fourth Amendment. Khanani also separately contends that the district court abused its discretion by failing to grant a mistrial because of an alleged extrinsic influence on the jury, and by admitting into evidence Portlock's statement that he "would not be surprised" by Khanani's involvement in the charged offenses. Portlock separately asserts that: the evidence was legally insufficient to prove the offense of conspiracy to harbor or shield illegal aliens from detection; or, alternatively, the offense of conspiracy to encourage or induce illegal aliens to reside in the United States when the government's evidence only showed that unauthorized workers were knowingly employed; the evidence was legally insufficient to prove guilt beyond a reasonable doubt as to Counts 54, and 56 through 71; and cumulative error exists that warrants the grant of a new trial. Additionally, the government cross-appeals, arguing that the district court erred by entering judgments of acquittal on the money-laundering conspiracy count (Count 55). For the reasons set forth below, we AFFIRM the district court in all respects.

2

# I. BACKGROUND

Khanani was a 40% owner of Big Bargain World, Inc. ("BBW"), SS Mart, Inc., and several retail stores, including Jeans Unlimited, Inc., and Denim Unlimited, Inc. Jesse Maali owned the remaining 60% stake. Portlock was an accountant and worked for Khanani and Maali as a comptroller. At least some of the employees at Jeans Unlimited and Denim Unlimited were aliens who were not authorized to work in the United States.

In November 2002, law enforcement agents raided and searched fourteen locations, including seven BBW stores, two Sports Dominator stores, a BBW corporate office/warehouse, the office of Maali Enterprises, Maali's residence, Portlock's office, and a storage unit rented by Portlock. The government seized multiple computer hard drives, as well as related equipment and software from the businesses and homes. An agent mirrored the computer hard drives after they were seized so that the data contained therein could be reviewed by investigators.

The search warrants were based on an FBI agent's affidavit, which alleged that the computers were "integral tools" of the claimed violations. The master affidavit limited the search to specified categories of documents pertaining to a number businesses and four individuals, and limited the chronological reach of the search to documents and records dating back to 1997. The affidavit also required

3

the search activity to be focused on materials related to specified immigration and tax violations.

On 21 July 2004, a federal grand jury returned a third superceding indictment charging Saleem Khanani and David Portlock, among others, with offenses relating to Khanani's employment of aliens who were not authorized to work the United States and to the related failures to pay state and federal taxes. The first 53 counts charged that Khanani, Portlock, and others had "encouraged and induced" named, unauthorized aliens to reside in the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). R552 at 1-4. Count 54 charged that the defendants had participated in a conspiracy to "conceal, harbor, and shield" these aliens from detection, also in violation of § 1324(a)(1)(A)(iii). Counts 56-58 charged that the defendants had mailed and e-mailed fraudulent state and federal tax forms, in violation of 18 U.S.C. §§ 1341 and 1343 and 18 U.S.C. § 2. Count 55 charged the defendants with conspiracy to launder the proceeds of the crimes charged in Counts 1-54 and 56-58, in violation of 18 U.S.C. § 1956(h). Counts 59-71 charged that the defendants had evaded federal employment and income taxes, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2. The government also sought the forfeiture of any assets the defendants had obtained through their crimes. Khanani and Portlock moved to suppress the evidence uncovered in the computer

4

searches, arguing, among other things, that the warrants were deficient because they failed to articulate any search protocol. After an evidentiary hearing, the court denied the motions to suppress.

At trial, Khanani's primary defense was that he merely employed undocumented workers and that mere employment, at most, constitutes a misdemeanor under a separate and uncharged provision of the immigration laws, 8 U.S.C. § 1324a. Khanani and Portlock requested that the court instruct the jury that "[t]he employment of an illegal alien in and of itself does not constitute" encouragement or harboring under § 1324(a). R755 at 4, 9. The requested instruction was denied.

Portlock testified during the defense's case. Portlock's counsel questioned him about his prior statements regarding Maali and Khanani's motives for hiring unauthorized aliens. Portlock denied telling agents that the reason for the separate entities was to facilitate Maali and Khanani's employment of unauthorized aliens to gain a competitive advantage. On cross-examination, the following colloquy occurred:

> Q. You said on your direct testimony . . . that you told the agents the reason for hiring [illegal aliens] was because Mr. Khanani was a charitable guy or a charitable person?

5

A. That was my perception, that he had met these people in his religious responsibilities as a leader in his religious community and they came to . . . him.

. . .

Q. Well, didn't you tell the agents that you wouldn't be surprised by anything that Mr. Khanani did?

R965 at 4216-17. After an objection and discussion with the court, the government rephrased its question, asking: "Did you tell the agents that you would not be surprised at Mr. Khanani's involvement because Mr. Khanani was much more interested in finding ways around employing the illegal aliens?" Id. at 4224. Portlock answered "I may have said that, yes." Id.

At the close of the evidence at trial, the district court denied the defendants' motions for judgment of acquittal on most counts but reserved judgment on Count 55, the money-laundering conspiracy count.

In instructing the jury regarding 18 U.S.C. § 1324(a), the district court charged the jury:

The elements of a violation of Section 1324[(a)(1)(A)(iv)] are as follows: First, that the defendant knowingly encouraged or induced a person who was, in fact, an alien to reside in the United States; and second, that the defendant either knew or acted in reckless disregard of the fact that the alien's residence in the United States was or would be in violation of law.

. . .

6

The elements of a violation of section 1324(a)(1)(A)(iii) are as follows: That an alien entered or remained in the United States in violation of law; second, that the defendant knowingly concealed, harbored or shielded from detection the alien within the United States; and third, that the defendant either knew or acted in reckless disregard of the fact that the alien entered or remained in the United States in violation of law.

R992 at 5518-19; see also id. at 5521. The court instructed the jury that:

To act knowingly means to act voluntarily and intentionally and not because of mistake or accident.

To act with reckless disregard means to be aware of, but consciously and carelessly ignore facts and circumstances clearly indicating that the person residing in the United States was an alien [that] had entered or remained in the United States in violation of law.

. . .

To conceal, harbor, or shield from detection includes any knowing conduct by the defendant tending to substantially facilitate an alien's escaping detection as an illegal alien, thereby remaining in the United States illegally.

Id. at 5519-20; see also id. at 5522. The court also instructed the jury that "[t]he word willfully, as that term is used in the indictment or in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is, with bad purpose either to disobey or disregard the law." Id. at 5555. The court also gave the jury instructions regarding the defendants' good faith defenses. Id. at 5549-54.

7

Before the jury retired to deliberate the forfeiture counts, the district court entered judgments of acquittal on the money-laundering conspiracy count, stating that the court later would enter a written order.[1]

The jury found Khanani guilty on all counts except 11 counts of encouraging or inducing aliens to reside in the United States, and Portlock guilty of Counts 54-71. The jury acquitted Khanani and Portlock of the remaining charges.

After the jury returned its verdict, a member of the jury ("Juror H") sent a note to the trial judge.[2] Juror H stated that during the trial, she had "locked eyes"

---

[1] On 28 February 2005, the district court entered a Memorandum Opinion setting forth the reasoning for its earlier decision to grant the defendants' motions for acquittal on Count 55. United States v. Maali, 358 F. Supp. 2d 1154 (M.D. Fla. 2005).

[2] The note, as read by the judge, is as follows:

> Your instructions to us as jurors at the beginning of this trial included the statement that we should bring to your attention anything that happened that affects us, no matter how insignificant . . . it may seem to be. In response to those instructions I believe I need to tell you something that occurred in the courtroom the second day before the last two alternates were dismissed. It's difficult to put into words, so I ask for your patience.
>
> That afternoon while taking notes I had the feeling someone was watching me. I looked up from the notes I had just made and immediately locked eyes with a man at the back of the courtroom who I had not seen before or since. Never have I felt such an overwhelming presence of danger or evil. It literally stunned me at the time and all I could think to do was pray. It took a few minutes to regain my composure. The jury was sent out again after a while and when we returned the man was gone.
>
> When we were finished for the day I walked with several other jurors to the parking garage. Upon exiting the elevator at the garage the feeling of being watched returned. The other jurors went a different direction to their cars and I proceeded to mine without incident[.] But I was unable to shake the feeling that someone was watching. However, I did not see

8

with a stranger at the back of the courtroom.  R884 at 24.  She claimed that he was menacing and resembled Khanani.  Juror H described being "stunned."  Id.  She associated an "overwhelming presence of danger or evil" with the man, id., who she said resembled Khanani.  In response to questioning, Juror H stated that she had not discussed this incident with fellow jurors, but eventually they learned of her general concern.  Further investigation by the court revealed that Juror H had told one other juror ("Juror S") of the incident on the day it took place.  The court determined that no reasonable possibility of prejudice existed, and denied Khanani's motion for a mistrial.

The district court sentenced Khanani to seventy months of imprisonment, to be followed by two years of supervised release, and Portlock to forty-eight months of imprisonment, to be followed by two years of supervised release.

---

anyone there.

The man of whom I speak bears some resemblance to Mr. Khanani. Appears younger, but with a receding hairline, and has much more muscular bulk, like a man who works out a great deal.  He has no facial hair.  All that could be seen of his attire was a bright blue polo type shirt. The incident I related has been hard to put into words without sounding like I'm paranoid, but continues to trouble me.  Even if we have finished our deliberations, I feel you should know.

R884 at 24-25.

Khanani and Portlock now appeal raising a host of issues, and the government cross-appeals the district court's grant of the defendants' motions for acquittal on Count 55, the money laundering count.

## II. DISCUSSION

A. "Mere employment" Instruction

Khanani and Portlock argue that the district court erred in refusing to give their proposed instruction that mere employment of undocumented workers cannot support a conviction for harboring, encouraging, or inducing aliens to enter or reside illegally in the United States.[3] A critical aspect of both Khanani and Portlock's defense was that they only employed undocumented workers and that mere employment, at most, constitutes a misdemeanor under a separate and uncharged provision of the immigration laws, 8 U.S.C. § 1324a, in contrast to the felony offense of encouragement and harboring, 8 U.S.C. § 1324(a), with which they were charged.

The district court's refusal to instruct the jury on the defendants' "mere employment" theory of defense is reversible error "if the requested instruction (1) was correct, (2) was not substantially covered by the court's charge to the jury, and

---

[3] Khanani's proposed jury instruction read: "The employment of an illegal alien in and of itself does not constitute encouraging or inducing such alien to reside in the United States as required to support a violation of Title 8, United States Code, as charged in Counts One through Fifty-three of the Indictment."  R755 at 4; see also id. at 9 (regarding harboring).

10

(3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." See United States v. Anderson, 326 F.3d 1319, 1330 (11th Cir. 2003) (citation and internal quotations omitted). A requested theory-of-defense instruction need only be a "substantially correct statement of the current law" and have "some basis" in the evidence. United States v. Morris, 20 F.3d 1111, 1116 (11th Cir. 1994).

We find that failure to give the requested "mere employment" instruction did not seriously impair the defendants' ability to conduct their defense. If Khanani merely had employed illegal aliens without "knowingly" encouraging or inducing them to reside in the United States, he would not have committed the elements of the offenses–as the court instructed the jury–and Portlock would not have been liable for the offense. See R992 at 5518-22; Pinkerton v. United States, 328 U.S. 640, 645-48, 66 S. Ct. 1180, 1183-84 (1946) (holding that a co-conspirator could be guilty of a substantive offense even though he did no more than join the conspiracy, provided that the offense was reasonably foreseeable and was committed in furtherance of the conspiracy). The jury instructions regarding the § 1324(a) offenses correctly addressed all elements of the offenses and implicitly acknowledged defendants' theory of defense. The district court was not required to instruct the jury that the employment of illegal aliens in and of itself did not

11

constitute a section 1324(a) offense because the instructions as given already required the United States to prove a level of knowledge and intent beyond the mere employment of illegal aliens.

B.  The Warrant Searches

Khanani and Portlock both contend that the trial court erred in not suppressing evidence obtained from the searches performed.  Specifically, Khanani and Portlock assert that the computer searches violated the Fourth Amendment in that: 1) the agents flagrantly disregarded warrant terms; 2) the warrant and supporting affidavit failed to identify any protocol or strategy for searching the computers and for ensuring that search remained within the probable cause limitations of the warrant; and, 3) the agents failed to keep any record or log of the searches that they conducted of the computer hard drives.  Separately, Portlock contends that agents seized Portlock's office computers without probable cause and that the district court erred in denying his motions to suppress other tangible evidence seized during searches of his office and storage unit.  Khanani and Portlock posit that we should vacate the convictions and remand for a determination whether the government can carry its burden of showing that the district court's refusal to suppress computer evidence constituted harmless error.

In reviewing the district court's denial of the defendants' motions to suppress the fruits of the government's searches, we examine the district court's legal conclusions de novo and its factual findings for clear error. See United States v. Pratt, 438 F.3d 1264, 1268 (11th Cir. 2006) (citation omitted). Total suppression of all items seized, including items within a warrant's scope, is not appropriate unless the executing officers' conduct "exceeded any reasonable interpretation of the warrant's provisions." United States Wuagneux, 683 F.2d 1343, 1354 (11th Cir. 1982) (citation omitted). "[A]bsent a 'flagrant disregard' of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized," id. (citations omitted), or "constitute reversible error on a direct appeal from the conviction." United States v. Lambert, 887 F.2d 1568, 1572 (11th Cir. 1989) (citations omitted).

The Fourth Amendment to the United States Constitution mandates that search warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." The point of the Fourth Amendment's particularity requirement is to protect individuals from being subjected to general, exploratory searches. Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S. Ct. 2002, 2038 (1971).

13

After a review of the record and defendants' arguments, we find that under all the circumstances, the searches and seizures were reasonable. See Wuagneux, 683 F.2d at 1352. We do not find evidence that suggests a "flagrant disregard" of the terms of the warrant such that blanket suppression of all items seized was required. See id. at 1354. Testimony at the suppression hearing established that all agents participating in the search of the first thirteen sites had been required to attend a briefing and to read the Master Affidavit before the search began. See id. at 1353-54. The district court credited "the agents' testimony that agents [had] been] instructed not to, and [had] made efforts not to, seize" records that were outside the warrant's scope. R589 at 58. Portlock has not shown this finding to be clearly erroneous. See, e.g., United States v. Travers, 233 F.3d 1327, 1331 (11th Cir. 2000) ("We find nothing in the record that would indicate that these factual findings that the officers obtained the warrant in cooperation with the United States Attorney who advised them on the requirements for showing probable cause and conducted their search in a conscious effort to stay within its limits are clearly erroneous." (citation omitted)).

Portlock contends that the seizure of his computers was without probable cause. Specifically, Portlock argues that the affidavit submitted to obtain the warrant order provided no fact-specific reason to believe there were computers in

Portlock's office, or that his computers had been used to facilitate the commission of any criminal violation of Title 8 or 26. "A warrant, and its corresponding search, violates the Fourth Amendment if it fails to specify the place to be searched and the items to be seized, or if it is issued by an official who is not neutral and detached, or if it is procured by a false statement made intentionally or recklessly, or if it is not supported by probable cause." United States Steel, LLC, v. Tieco, Inc., 261 F.3d 1275, 1290 (11th Cir. 2001) (internal citations omitted). None of the foregoing occurred in this case. Here, the Master Affidavit describes Portlock as Maali's accountant, and one of Maali's tax returns had been found in the trash outside Portlock's office. While the Master Affidavit did not indicate that it was a computer-generated tax form, in reviewing the affidavit to ascertain whether it furnished probable cause for the warrant sought, the affidavit is given a "common sense and realistic" interpretation. See United States v. Maestas, 546 F.2d 1177, 1180 (5th Cir. 1977). Additionally, task force coordinator Stephen Thomas testified, that prior to the warrant application, he had entered Portlock's office and observed connected computers. The district court did not err in concluding that the allegations of the Master Affidavit were sufficient to provide probable cause for the seizure of computers from Portlock's accouting business.

Khanani and Portlock also contend that the lack of a written "search protocol" required the district court to suppress all evidence agents seized as a result of the search of the defendants' computers. The testimony at the suppression hearing established that the agents attempted to identify computers that contained information that was responsive to the warrants and that they did not seize every computer that they encountered. Thereafter, a computer examiner eliminated files that were unlikely to contain material within the warrants' scope. The culling process winnowed down the files seized from approximately three million to approximately 270,000. FBI Agent Scott Skinner testified that agents used "keyword searches," and "if a document was opened and it wasn't . . . covered by the warrant, then it wasn't analyzed." R423 at 928, 944. Khanani and Portlock fail to cite any binding case law that would lead us to conclude the procedures used in this case infringed defendants' Fourth Amendment rights.

C. Extrinsic Influence on the Jury

Khanani argues that the district court erred in denying his motion for a mistrial based on the jury's exposure to inflammatory extrinsic influence. Specifically, he contends that one of the jurors associated an "overwhelming presence of danger or evil" with Khanani and his family. R884 at 24. The government responds that no juror was exposed to an external influence; rather,

16

one juror stated, after the verdict had been rendered, that she thought that a person in the courtroom gallery who resembled Khanani had "locked eyes" with her, id., but she insisted, along with the other jurors, that the incident had not influenced the verdicts.

We review the district court's denial of Khanani's motion for a new trial based on the allegation that the jury was exposed to prejudicial extrinsic influence for abuse of discretion. See United States v. Carpa, 271 F.3d 962, 967 (11th Cir. 2001) (per curiam) (citation omitted). "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." Remmer v. United States, 347 U.S. 227, 229, 74 S. Ct. 450, 451 (1954); McNair v. Campbell, 416 F.3d 1291, 1307 (11th Cir. 2005) (citations omitted). A juror's exposure to extraneous material or influence requires a new trial if the exposure "poses a reasonable possibility of prejudice to the defendant." United States v. Rowe, 906 F.2d 654, 656 (11th Cir. 1990) (emphasis and citations omitted). For the presumption to be triggered, a defendant must establish that an extrinsic contact with a jury, in fact, occurred. United States v. Caporale, 806 F.2d

17

1487, 1503 (11th Cir. 1986) (citation omitted).  After this showing is made, the burden shifts to the government to prove that the extrinsic contact was not prejudicial.  Id. (citation omitted).  "The factual determination of whether consideration of extrinsic evidence caused the defendant prejudice is committed to the trial court's 'large discretion.'" BankAtlantic v. Blythe Eastman Paine Webber, Inc., 955 F.2d 1467, 1472 (11th Cir. 1992) (citation omitted).  The juror's testimony "that the extrinsic information was harmless is not controlling." United States v. Bolinger, 837 F.2d 436, 440 (11th Cir. 1988) (citation omitted).  "The district court may consider such testimony, but it must also consider other factors such as the nature of the extrinsic evidence and the strength of the evidence properly presented by the government against the defendant." Id.

We cannot say the district court abused its discretion in denying a motion for a new trial based on the facts presented here.  After interviewing the jurors separately, the district court concluded that no juror had been improperly influenced by Juror H's experience.  Juror H never alleged that anyone had contacted her with any message or directive.  Rather, she merely alleged that an unidentified man vaguely resembling Khanani "locked eyes" with her on one occasion, giving her a sense of danger and that she felt like someone had been

18

watching her in the parking garage although she had not seen anyone and proceeded to her car without incident. R884 at 24.

After receiving the juror's note, the district court conducted a hearing and questioned each juror regarding the impact of Juror H's experience on each juror's ability to resolve the case impartially and based on the evidence presented at trial. See United States v. Winkle, 587 F.2d 705, 714 (5th Cir. 1979) ("Where a colorable showing of extrinsic influence appears, a court must investigate the asserted impropriety."). The court questioned Juror H twice; both times she confirmed that her experience had not affected her deliberations. Each juror stated that although Juror H had recounted her experience to the others, the comments had not affected their deliberations. Although Juror H's testimony is not controlling, the district court properly considered it, in conjunction with other factors. See Bolinger, 837 F.2d at 440. There is additional evidence, apart from Juror H's own unequivocal subjective assessment, to support the district court's conclusion that she was and could remain impartial. For example, Juror H declined an offer to provide her with an escort to her car during sentencing, responding, "I don't really feel unsafe, but I appreciate your offer." R998 at 6020-21; accord United States v. Vega, 285 F.3d 256, 267 (3d Cir. 2002) (finding that juror's declination of a courthouse escort to his car "conveyed that his level of fear

19

was mild and supported his subjective assessment that he could remain impartial for the remainder of the trial"). As a result, even assuming an extrinsic contact with a jury, in fact, occurred, it was not prejudicial.

D. Portlock's Statement that he "would not be suprised" by Khanani's Involvement

Portlock's direct testimony was that he had previously told federal agents that Khanani hired undocumented workers for religious and charitable reasons. The statement elicited from Portlock on the government's cross-examination was that Portlock "may have" told the agents that he "would not be surprised at Mr. Khanani's involvement [in "paying [undocumented workers] off the books"] because Mr. Khanani was much more interested in finding ways around employing the illegal aliens." R965 at 4224. Khanani asserts that his co-defendant's statement that he "would not be surprised at Mr. Khanani's involvement" in the charged offenses because "Khanani was much more interested in finding ways around employing the illegal aliens," id., was inadmissible hearsay and highly prejudicial.

We review the district court's admission of Portlock's statement for abuse of discretion. See Mercado v. City of Orlando, 407 F.3d 1152, 1161 (11th Cir. 2005). "Prior statements of witnesses are hearsay and are generally inadmissible as affirmative proof." United States v. Gregory, 472 F.2d 484, 487 (5th Cir. 1973). It

20

is a well-established principle of evidence, however, that prior inconsistent statements of a witness are admissible to impeach that witness. See United States v. Palacios, 556 F.2d 1359, 1362-63 (5th Cir. 1977) (citations omitted).

Even if an evidentiary ruling is erroneous, "that ruling will result in reversal only if the error was not harmless." United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999) (citations omitted). "An error is harmless unless there is a reasonable likelihood that [it] affected the defendant's substantial rights." Id. (citation and internal quotations omitted). No reversal will result if "sufficient evidence uninfected by any error supports the verdict," and the error did not have a "substantial influence on the outcome" of the case. Id. (quotations and citations omitted). We examine the entire record, comparing the error with "the strength of the evidence of defendant's guilt," to determine "whether an error had substantial influence on the outcome." Id. (quotations and citations omitted).

We find that the district court did not abuse its discretion in admitting Portlock's statement, and that Portlock's statement on cross-examination was admissible to impeach. The district court stated that it did not believe the testimony was hearsay because it was not being offered for the truth of the matter asserted and the statement sought was relevant "because [Portlock]'s already given a characterization about [Khanani]'s religious activities." R965 at 4223.

21

Portlock's counsel had elicited testimony from Portlock regarding his statements to agents about Khanani's motive for employing unauthorized aliens. The government was entitled to cross-examine Portlock on this subject and to show that his prior testimony was incomplete or dishonest. "[S]tatements need not be diametrically opposed to be inconsistent." United States v. Strother, 49 F.3d 869, 874 (2d Cir. 1995) (quotation and citation omitted). Here, Khanani was entitled on request to an instruction limiting the jury's consideration of Portlock's statements to impeachment purposes, in accordance with FRE 105, yet failed to make such a request. As a result, Khanani procedurally defaulted his claim that the lack of an instruction constituted error. Yeck v. Goodwin, 985 F.2d 538, 542 (11th Cir. 1993).[4]

E. Sufficiency of the Evidence

Portlock asserts that the district court erred in refusing to enter judgments of acquittal on all charges against him. "Sufficiency of the evidence is a question of law reviewed de novo." United States v. Martinez, 83 F.3d 371, 374 (11th Cir. 1996) (citation omitted). In reviewing the sufficiency of the evidence, we must

---

[4] Moreover, even if the district court erred, we find that any error was harmless. See United States v. Cameron, 907 F.2d 1051, 1059 (11th Cir. 1990) (citations omitted). Here, the district court's admission of a single statement by a co-defendant that he may have said that he would not have been surprised by Khanani's involvement, in a trial that was over two months long and where the testimony regarding Khanani's involvement in numerous aspects of the conspiracy was overwhelming, did not have a substantial influence on the outcome of the case. See Hands, 184 F.3d at 1329.

22

"view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." Id. (citation omitted). When, as here, a defendant renews a motion for judgment of acquittal at the close of all the evidence, we must also examine the evidence presented by the defense in determining the sufficiency of the evidence. See United States v. Evans, 572 F.2d 455, 479 (5th Cir. 1978).

The evidence showed that Portlock frequently worked in the BBW offices, had met privately with Khanani and Maali, and had maintained an office in the BBW warehouse. As comptroller of BBW, Portlock had been responsible for "all of the tax issues, the insurance issues, [and] the [credit] card issues." R931 at 944-45; see also id. at 889-90. Portlock had handled all of the sales tax reports for BBW, received some confidential reports regarding BBW's sales performances and labor status, and had attended some meetings of BBW's executive committee. Portlock also had received financial reports from the various companies so that he could prepare the tax returns. The evidence reveals that Portlock participated in creating sham companies to pay the unauthorized aliens and that he knew the companies' purpose. When asked whether one of the companies was paying its taxes, Portlock stated that it was not. Suleiman Mussalam, who worked for BBW under Portlock's direction, testified that everyone who worked in the office knew

23

that BBW employed illegal workers. BBW's operations manager, Mahmood Jamal, testified that when he raised concerns about the large percentage of BBW's workforce that was unauthorized aliens, Maali told him that Portlock was taking care of things.

Notes in Portlock's handwriting also indicate his knowledge of the "[d]istortion of financial statements." R931 at 926-27. Portlock admitted that he wrote notes with the recognition that BBW's method of handling the payment of its employees might garner the attention of law enforcement, and that he suspected that the other defendants had been using cash from sales to pay the unauthorized aliens.

Testimony further established that the defendants created a work environment that was well known in the alien community as being open to and safe for workers not authorized to work in the United States. Moreover, the evidence established that defendants had shielded their unauthorized workforce from detection, by alerting the aliens to the presence of immigration officials in the stores, by instructing workers not to wear name tags, and by sending them home or to other locations undetected. Unauthorized aliens enjoyed housing assistance as well. Numerous aliens testified that their employment with defendants' companies helped them continue to reside in the United States.

The evidence further demonstrated that Khanani and Portlock instructed BBW employee Muzaffar Shuja to create General Services Supply, Inc. ("GSS"), in Shuja's name, to use to pay unauthorized aliens. Portlock told Shuja that GSS would pay the required taxes, and Portlock prepared the necessary paperwork, which Shuja signed. BBW hired a loss prevention company that submitted a written report to Khanani noting that BBW employees were being paid in cash and that no taxes were being withheld or remitted and "strongly [urging] [BBW] to protect itself from what would be a genuinely painful experience of interaction with the U.S. Government." Govt. Exh. 95; see also R932 at 1129-30. Shortly thereafter, Maali, Khanani, and Portlock set up four companies to help them hide the cash that they were skimming from the jean sales and to allow them to pay the unauthorized aliens with paychecks in a manner in which it would appear that the unauthorized aliens were working for these companies rather than for BBW. Portlock knew what these four companies were being used for and he approved their use.

It is true that at trial, Portlock testified on his own behalf and denied that he had known that BBW was using cash skimmed from profits to pay a workforce consisting largely of unauthorized aliens. However, "when a defendant takes the stand in a criminal case and exposes his demeanor to the jury, the jury may make

25

adverse determinations about his credibility and reject his explanation as a complete fabrication." See United States v. Vazquez, 53 F.3d 1216, 1225 (11th Cir. 1995) (citation omitted).

Consequently, the jury could reasonably have found that Portlock knew that his efforts in forming the four sham companies furthered the defendants' actions in harboring the aliens and in encouraging them to remain in the United States, and that his preparation of BBW's tax returns was done with knowledge that the information in those returns improperly omitted sales that were diverted toward the payment of unauthorized aliens. Because we find that Portlock's conviction for Count 54, the charge of conspiracy to violate 8 U.S.C. § 1324(a)(1)(A)(iii) and (iv), and Counts 56 through 71 was supported by the evidence, we find that the district court correctly denied Portlock's motion for a judgment of acquittal.

F. Cumulative Effect of Errors

Portlock asserts that even if we determine that any errors he has identified were harmless, a new trial should be ordered based on the doctrine of cumulative error. "We have held that the cumulative effect of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible." United States v. Thomas, 62 F.3d

1332, 1343 (11th Cir. 1995) (citations omitted). As detailed above, Portlock has failed to identify any trial errors, and is thus is not entitled to a new trial.

G. Acquittal on the Money-laundering Conspiracy Count

In its cross-appeal, the government contends that the district court relied on an overly narrow definition of the term "proceeds" as used in the money laundering statutes, leading to the improper entry of judgments of acquittal on the money-laundering conspiracy charges (Count 55). In entering post-verdict judgments of acquittal on the charge that the defendants had conspired to launder the proceeds of their immigration offenses, mail fraud, and wire fraud, the district court ruled that "profits or revenue indirectly derived from labor or from the failure to remit taxes" cannot constitute "proceeds of a specified unlawful activity" pursuant to 18 U.S.C. § 1956 or § 1957. Maali, 358 F. Supp. 2d at 1160. The government posits that the correct interpretation of the term "proceeds" includes profits the defendants earned as a result of their § 1324(a) offenses and their mail and wire fraud offenses. Such a definition, the government asserts, is consistent with other provisions of the money-laundering statutes and with cases addressing the term "proceeds" in contexts other than the sale of goods.

Khanani and Portlock respond that the district court correctly granted a judgment of acquittal on the charge of conspiracy to launder money. They assert

27

that the court properly concluded that the government's theory of tax and cost savings did not give rise to "proceeds" capable of being laundered in a financial transaction. Essentially, the defendants posit that the predicate offense conduct involved no sale or exchange by which they received money or property and the funds actually being deposited into the accounts of the nominal companies consisted of revenues generated through lawful retail sales.

We review de novo a district court's decision to grant a judgment of acquittal. See United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005). To establish that defendants violated 18 U.S.C. § 1956(h), the government had the burden of showing that Khanani and Portlock conspired to launder or to engage in a monetary transaction involving the "proceeds of specified unlawful activity ["(SUA")]."[5]

---

[5] The text of 18 U.S.C. § 1956 reads, in relevant part:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or
>
> (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
>
> (B) knowing that the transaction is designed in whole or in part--
>
> (i) to conceal or disguise the nature, the location, the source, the

Here, the United States charged that the defendants had conducted financial transactions in the "proceeds" of the section 1324(a) violations charged in counts 1-54 of the indictment, mail fraud as charged in Count 57 of the indictment, and wire fraud as charged in Count 56 of the indictment, all of which are delineated as SUAs under the money laundering statute. See 18 U.S.C. §§ 1956(c)(7)(A), 1961(1). At trial, the government claimed that the tax and cost savings from hiring illegal aliens constituted "proceeds" that Khanani and Portlock then deposited into the accounts of shell companies for the purposes of concealing their unlawfully derived income and promoting their illegal employment scheme. The defendants, citing United States v. Christo, argued that they never completed a predicate offense that yielded "proceeds" that they could have laundered. See 129 F.3d 578, 579-80 (11th Cir. 1997) (per curiam) (holding that it is only after a "predicate crime becomes 'a completed offense'" that a "money laundering can occur."). Moreover, they continued, neither the tax nor labor cost savings that they enjoyed from hiring illegal aliens constituted "proceeds."

While rejecting the defendants' broad interpretation of Christo, the district court nevertheless granted their motions for acquittal, finding that the

ownership, or the control of the proceeds of specified unlawful activity . . . .

29

government's "cost savings theory [was] at odds with the plain and ordinary meaning of 'proceeds,'" Maali, 358 F. Supp. 2d at 1158, because the underlying predicate offense conduct had contained no sale, transaction, or exchange component by which the defendants had obtained proceeds. In other words, the district court refused to equate BBW's jean retail sales revenues with "proceeds" on the rationale that the revenues were illegally obtained because BBW had used illegal workers and had filed false employment tax forms.

In granting the judgments of acquittal, the district court acknowledged that the United States had proved that the defendants had paid unauthorized aliens with income skimmed from sales at their businesses; had not reported that income to the IRS; and had failed to remit federal or state employment taxes on the workers' wages. Id. at 1156. The district court also acknowledged that there is disagreement among courts and dictionaries as to whether "proceeds" contemplates "net profits," "gross receipts," or "gross profits," but, where the basic meaning of "proceeds" is concerned (as opposed to the precise scope of the term), it found courts generally in accord. Essentially, the district court concluded that "proceeds "are something which is obtained in exchange for the sale of something else as in, most typically, when one sells a good in exchange for money." Id. at 1158. The district court observed that: "[T]he government's approach would stretch the

30

definition of 'proceeds' well beyond any ordinary conception of the term and thereby lay the foundation for an unprecedented expansion of the money laundering statute." Id. at 1159.

We agree with the district court that "it is clear that the term ['proceeds'] does not contemplate profits or revenue indirectly derived from labor or from the failure to remit taxes. While it is natural and clearly correct to say that Defendants received 'proceeds' from the sale of jeans, it is, by contrast, both causally tenuous and decidedly unnatural to say that the moneys one has received from the sale of a good are, not the 'proceeds' from the sale of a good, but 'proceeds' of the labor used to produce the good." Id. at 1160; see also Anderson v. Smithfield Foods, Inc., 209 F. Supp. 2d 1270, 1275 (M.D. Fla. 2002) ("Saving money as a result of the alleged noncompliance with the requirements of an environmental statute does not make the money illegally obtained for the purposes of the money laundering statute.").

The government fails to point to any binding case law that requires us to construe "proceeds" as broadly as it advocates in this situation here.[6] In fact, two

_____

[6] In United States v. Silvestri, 409 F.3d 1311, 1333 (11th Cir.), cert. denied, 126 S. Ct. 772 (2005), we used Webster's Third New International Dictionary 1807 (3d ed. 1961) to state that "[t]he term 'proceeds' simply represents 'what is produced by or derived from something (as a sale, investment, levy, business) by way of total revenue; the total amount brought in.'" There, however, the issue was whether the term "proceeds" includes check deposits, and we held, citing Black's Law Dictionary, that "proceeds" may be in a form other than cash. Id. at 1333-35. Silvestri did not address whether the term contemplated profits or revenue *indirectly*

31

cases cited by the government support the district court's construction of the term "proceeds." See United States v. Rudisill, 187 F.3d 1260, 1262, 1267 (11th Cir. 1999) (where the SUA was interstate transportation of securities taken by fraud, "proceeds" were the monies that the defendants obtained from the victims of their fraudulent telemarketing scheme in the form of checks); United States v. Baker, 227 F.3d 955, 958, 964 (7th Cir. 2000) (where instances of SUA were violations of the Travel Act, "proceeds" were the monies that defendants obtained from their prostitution business by credit card and ATM transactions); see also United States v. Adams, 74 F.3d 1093, 1096 (11th Cir. 1996) (where SUA was impeding the lawful functions of the Resolution Trust Corporation, defendants obtained proceeds by fraudulently inducing transfers of funds from the RTC in the form of checks).[7] As a result, the district court did not err by entering a judgment of acquittal.

---

derived from labor or from failure to remit taxes.

[7] The government's assertion that United States v. Dennis, 237 F.3d 1295, 1302 (11th Cir. 2001), which upheld a money-laundering conviction of a defendant where the underlying SUA was bankruptcy fraud, conflicts with the district court's construction of "proceeds" is unavailing. In Dennis, we held that where a defendant had taken money, in the form of checks, from concealed corporate bank accounts and transferred them into personal brokerage accounts during bankruptcy proceedings, the monies were proceeds of bankruptcy fraud. Id. at 1302. Dennis did not address a definition of "proceeds" based on a theory of cost or tax savings.

## III. CONCLUSION

We hold that the district court did not err in declining to give the requested "mere employment" instruction or in refusing to suppress all the evidence seized or the evidence found from the search of certain computers. Nor did the court abuse its discretion in denying a motion for a new trial based on the allegation that the jury was exposed to prejudicial extrinsic influence. We find that the district court did not abuse his discretion by admitting Portlock's statement that he "would not be surprised" by Khanani's involvement in the charged offenses. R965 at 4224. Moreover, the district court correctly denied Portlock's motion for a judgment of acquittal on Counts 54, and 56 through 71 and a new trial is not warranted. Finally, the district court did not err in entering judgments of acquittal on Count 55, the money-laundering conspiracy count.

**AFFIRMED.**