[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-12167

_____

WILLIAM O. FULLER,
MARTIN A. PINILLA, II,

                                              Plaintiffs-Appellees,

*versus*

JOE CAROLLO,

                                              Defendant-Appellant,

JOHN DOES 1-10, et al.,

                                              Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:18-cv-24190-RS

_____

Before ROSENBAUM, BRANCH, and KIDD, Circuit Judges.

PER CURIAM:

Joe Carollo, a sitting commissioner of the City of Miami, appeals the district court's entry of final judgment on a jury verdict levying over $60 million in damages against him. Plaintiffs William O. Fuller and Martin Pinilla, II claimed that Carollo retaliated against them for supporting one of Carollo's election opponents in violation of their First Amendment rights. After a 24-day trial, the jury found in favor of Fuller and Pinilla. Carollo now attacks the judgment on three grounds: (1) jury tampering occurred and warrants a new trial, (2) the district court should have granted him judgment as a matter of law, and (3) the jury's damages award was excessive and warrants a new trial or remittitur. We conclude that the district court properly handled Carollo's accusations of jury tampering and that we lack appellate jurisdiction over the remaining issues. Thus, after careful review and with the benefit of oral argument, we affirm in part and dismiss in part.

## I.      Background

Carollo represents Miami's District 3, which includes the Little Havana neighborhood. Plaintiffs are Miami businessmen

whose work centers around the Little Havana neighborhood. Plaintiffs manage several projects, businesses, and properties in Little Havana and around Miami.

In 2017, Miami held an election for District 3 Commissioner. In that election, Carollo advanced to a run-off against Alfonso "Alfie" Leon. Plaintiffs supported Leon in that election, often through one or more of their businesses. Carollo disliked plaintiffs' opposition to his candidacy, and he made his animus towards plaintiffs well-known.

During and after the 2017 election, which Carollo won, Carollo tried to sic other Miami officials (including the city attorney, police, and code-enforcement officers) on plaintiffs to have their businesses and tenants selectively inspected or to have the city code selectively enforced against them.[1] Carollo also publicly accused plaintiffs of being "money launderers connected to the communist regime" and called Fuller "a criminal Godfather." Several other Miami officials expressed concern about Carollo's behavior towards plaintiffs. In 2018, in response to Carollo's conduct, Fuller filed an ethics complaint against Carollo. Afterwards, Carollo "elevated the attacks" against plaintiffs.

Based on Carollo's attacks, plaintiffs brought this suit in 2018. Plaintiffs' operative complaint alleged one count of

---

[1] Trial evidence reveals that several of plaintiffs' entities or tenants did, in fact, violate city ordinances and the Florida Building Code.

retaliation in violation of the First Amendment and 42 U.S.C. § 1983 against Carollo.  The parties went to trial in 2023.

On day seven of the trial, the district court received a note from Juror 3.  Juror 3 reported that after day five of the trial, she left the courthouse and went to her car in a parking garage.  While waiting for the elevator, "a young man that [Juror 3] recognized from attending the trial on the plaintiffs' side arrived in the same area to wait for the elevator."  The man was later identified as Zach Bush, one of plaintiffs' business partners.  In the elevator, Juror 3 pushed the button to go to the fifth floor, and Bush "did not press any floors which made [Juror 3] feel very weary [*sic*]."  Juror 3 asked Bush what floor he was going to, and Bush "responded in a funny manner with laughter, 'I'm following you.'"  Bush clarified he was "going to five also."  Then, as Juror 3 and Bush left the elevator, he told Juror 3 "that people should be careful because last week or a few days ago, a former chief of police came to testify in a case and when the former chief of police was leaving, he was followed by two [private investigators]."  Bush told Juror 3 that that incident "was also on social media" and that "everyone should be careful."  Juror 3 "strongly believe[d] that this gentleman [knew] [Juror 3 was] in the jury."

After the district court read Juror 3's note to the parties' counsel, counsel agreed "that a brief inquiry in camera by Your Honor of the juror" would be appropriate.  The district court cleared the courtroom except for counsel and questioned Juror 3 about the incident.  During the questioning, Juror 3 told the court

she did not do any follow-up research on the internet about the incident or the private investigators. Juror 3 did, however, relay her contact with Bush to other jurors, who encouraged her to report it to the court. Absent their encouragement, Juror 3 "didn't know if this was like worth even bringing forward." Juror 3 repeatedly insisted she felt comfortable remaining a juror in the case and that she could continue to be fair and impartial. On Juror 3's way out of the courtroom, the district judge told her "I appreciate you," to which Juror 3 responded "No problem. Scared me. It's all good."

After Juror 3 left the courtroom, the parties' counsel again agreed that "a full inquiry with the other jurors would be appropriate." Notably, Carollo's counsel complimented the district court on its questioning of Juror 3:

> I have to say I've done lots of these jury inquiries before. The way you handled it is exactly the way I would have expected you would do, so that kind of personality and discussion was very disarming—not disarming—very comfortable. And I think doing that with all the jurors would be appropriate.

The district court then questioned each of the remaining jurors one-by-one to determine if Juror 3 shared her experience with any of them. Each juror who heard about Juror 3's contact with Bush said it did not affect his or her ability to remain impartial. Afterwards, Carollo's counsel again complimented the district court: "With regard to the inquiry, we appreciate the detail of Your

Honor's inquiry." Carollo's counsel, however, was concerned that, given the allegations in the case, the jury might believe that Carollo was behind the incident, and insisted that "any curative instruction . . . would have to make clear to the jury that this incident has nothing to do with this case." Accordingly, the district court instructed the jury "that this contact had nothing to do with either party. It has nothing to do with the plaintiff, neither the defendant, Commissioner Joe Carollo, and that the contact is impermissible." Moreover, the district court repeatedly instructed the jury that the contact between Bush and Juror 3 should not affect their deliberations.

Based on Bush's contact with Juror 3, Carollo moved for a mistrial orally and in writing. The district court denied Carollo's motion.

After plaintiffs rested their case, Carollo moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). In that motion, Carollo argued that (1) plaintiffs failed to prove they engaged in protected speech; (2) plaintiffs failed to prove their speech was chilled; (3) plaintiffs failed to establish a causal link between Carollo's conduct and plaintiffs' alleged protected speech; and (4) plaintiffs failed to adequately prove damages. The district court denied Carollo's motion. The jury ultimately found Carollo liable for retaliating against plaintiffs in violation of the First Amendment and 42 U.S.C. § 1983. The jury awarded Fuller $8.6 million in compensatory damages and $25.7 million in punitive damages. The jury awarded Pinilla $7.3 million

in compensatory damages and $21.9 million in punitive damages. The district court entered judgment on the verdict.

After the entry of judgment on the jury's verdict, Carollo renewed his motion for judgment as a matter of law under Rule 50(b) and moved for a new trial under Rule 59. In his Rule 50(b) motion, Carollo argued that (1) plaintiffs failed to prove they engaged in protected activity; (2) plaintiffs failed to prove a causal connection between their conduct and Carollo's conduct; and (3) plaintiffs failed to prove damages. In his Rule 59 motion, Carollo argued that the damages were excessive, and several errors required a new trial. Carollo also alternatively moved for remittitur under Rule 59.

While Carollo's Rule 50(b) and Rule 59 motions were pending, Carollo appealed the final judgment entered on the jury's verdict. In his notice of appeal, Carollo noted in a footnote that his post-trial motions remained pending. He asked us to "permit adjudication of the pending post-trial proceedings and recognize this notice as effective to appeal the final judgment as of the last order resolving such pending post-trial motions." Subsequently, the district court denied Carollo's post-trial motions. Carollo did not file a new or amended notice of appeal following the denial.

## II.    Discussion

Carollo raises three issues on appeal: (1) whether jury tampering warranted a new trial, (2) whether he is entitled to judgment as a matter of law because plaintiffs failed to prove three elements of their claims, and (3) whether a new trial or remittitur

is warranted because the jury's awarded damages are excessive. We answer the first issue in the negative and conclude that we do not have appellate jurisdiction to address the remaining issues.

A.      *The district court did not abuse its discretion by denying Carollo's motion for a mistrial based on purported jury tampering*

Carollo argues that the district court erred by denying his motion for a mistrial. He maintains that Bush's contact with Juror 3 created a presumption of prejudice that plaintiffs have not rebutted, and the district court failed to adequately investigate Bush's contact with Juror 3. Plaintiffs respond that the district court adequately investigated Bush's contact with Juror 3 and correctly concluded that the contact was fleeting and inconsequential. In reply, Carollo reiterates that the district court failed to apply a presumption of prejudice and failed to adequately investigate Bush's contact with Juror 3; thus, the presumption of prejudice was not rebutted. We agree with plaintiffs.

Carollo's arguments on appeal require us to ask two questions: (1) was the district court's investigation satisfactory; and (2) if so, was the district court's denial of a mistrial, in light of the evidence uncovered, an abuse of discretion? We have explained that "[w]hen an allegation of juror misconduct arises, the court must determine whether the misconduct occurred and whether it was prejudicial." *United States v. Ifediba*, 46 F.4th 1225, 1238 (11th Cir. 2022).[2] "A [district] court abuses its discretion and commits

_____

[2] *Ifediba* is a criminal case, but the same principles apply to civil juries. *See, e.g.*, *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1471–73 (11th

reversible error when it fails to investigate as thoroughly as the situation requires and the insufficient investigation prejudices the defendant." *Id.* "When a party makes a colorable showing of extrinsic influence, the court must investigate to determine whether the influence was prejudicial." *Id.* at 1239 (quotation omitted). Once the district court concludes its investigation, "the factual determination of whether consideration of extrinsic evidence caused the defendant prejudice is committed to the trial court's large discretion." *United States v. Ronda*, 455 F.3d 1273, 1301 (11th Cir. 2006) (alteration adopted) (quotations omitted).

Turning to the quality of the district court's investigation of extrinsic contact with a juror, after examining the specific circumstances of the alleged extrinsic influence, we have approved of district courts' investigations where, for example, (1) the parties agreed to the method and thoroughness of the investigation, *see Ifediba*, 46 F.4th at 1240; (2) the district court individually questioned the affected juror and every other juror, *see United States v. Khanani*, 502 F.3d 1281, 1291–92 (11th Cir. 2007); *Ronda*, 455 F.3d at 1300;[3] (3) each juror gave assurances that he or she could remain impartial, *see Khanani*, 502 F.3d at 1292; and (4) the district court collectively instructed the jury to remain impartial, *see Ifediba*, 46

Cir. 1992) (relying, in a civil case, on criminal precedents for the law governing jurors' consideration of extrinsic evidence). The parties agree that it is appropriate for us, in this civil case, to look to criminal cases for guidance on alleged juror misconduct.

[3] We have emphasized, however, that "individual questioning of the jury is not to be undertaken lightly" or in every case. *Ifediba*, 46 F.4th at 1241.

F.4th at 1240–41; *Ronda*, 455 F.3d at 1300. By contrast, in a case involving attempted jury tampering, we have disapproved of the thoroughness of a district court's investigation where the court failed to question each juror about whether the contacted juror shared any "extraneous prejudicial material" with them. *United States v. Forrest*, 620 F.2d 446, 449, 456–58 (5th Cir. 1980).[4]

Here, the district court's investigation was "as thorough[] as the situation require[d]." *Ifediba*, 46 F.4th at 1238. First, the parties agreed on the method of questioning, and the district court proceeded to question Juror 3 individually. *See id.* at 1240. Then, the district court—again at the urging of the parties—questioned every other juror individually to determine if Juror 3 said anything to them about her contact with Bush. *See Khanani*, 502 F.3d at 1291–92; *Ronda*, 455 F.3d at 1300; *cf. Forrest*, 620 F.2d at 457–58 (remanding for questioning of the other jurors). Each juror who heard about Juror 3's contact with Bush assured the court that the incident would not affect his or her impartiality. Juror 3 gave repeated, similar assurances: she still felt "comfortable being a juror" in the case, she "[a]bsolutely" could "continue to be fair and impartial," she "[a]bsolutely" could follow the court's instructions to "disregard" the incident, and she insisted the incident was "not impacting [her] ability" to be fair and impartial to both sides of the case. *See Khanani*, 502 F.3d at 1292 ("The court questioned Juror H

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), we adopted as binding all Fifth Circuit precedent handed down prior to October 1, 1981.

twice; both times she confirmed that her experience had not affected her deliberations."). Indeed, Juror 3 was so unfazed that she questioned whether this incident was "worth even bringing forward" to the court's attention. Finally, the district court issued a curative instruction to the jury to disregard the incident entirely. *See Ronda*, 455 F.3d at 1300; *Ifediba*, 46 F.4th at 1240. Accordingly, we conclude that the district court sufficiently investigated Carollo's claims of jury tampering.[5]

Carollo resists this conclusion and argues that the district court should have questioned Bush himself, otherwise the court received "only half of the story." Carollo, however, fails to explain how such questioning would have been relevant. After all, an inquiry into whether contact was "prejudicial" means determining whether *the jury was affected* by the contact. *See Ifediba*, 46 F.4th at 1238. Regardless of the evidence Bush might have supplied to the district court, such evidence is irrelevant in light of the jurors' individual responses that the contact had no effect on them

---

[5] After all, even Carollo's own trial counsel commended the district court on the thoroughness of its inquiry, stating: "I have to say I've done lots of these jury inquiries before. The way you handled [questioning Juror 3] is exactly the way I would have expected you would do . . . . And I think doing that with all the jurors would be appropriate." Counsel further stated that "[w]ith regard to the inquiry, we appreciate the detail of Your Honor's inquiry." *See also Ifediba*, 46 F.4th at 1240 ("Significantly, Ifediba's counsel agreed to the court's proposed method of questioning the alternate [juror] and declined the opportunity to request a sidebar during her questioning or ask further questions.").

whatsoever.  Thus, the district court did not err in its investigation by declining to call Bush in to testify.

And once the district court completed its sufficiently thorough investigation, it did not err by denying Carollo's motion for a mistrial because the purported extrinsic contact was not prejudicial.  *See Ifediba*, 46 F.4th at 1238, 1241 & n.8.  The parties vigorously dispute whether a "presumption of prejudice" attached to Bush's contact with Juror 3 in this case.  We assume without deciding that the presumption of prejudice attached, but we conclude that the presumption was rebutted in this case.

In *Remmer v. United States*, the Supreme Court declared that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial."  347 U.S. 227, 229 (1954).  Accordingly, we have repeatedly applied a presumption of prejudice where extrinsic contact with a juror—that is, discussions about the case between a juror and a non-juror—occurs.  *See Forrest*, 620 F.2d at 457; *United States v. Caporale*, 806 F.2d 1487, 1502–03 (11th Cir. 1986); *United States v. Spurlock*, 811 F.2d 1461, 1463 (11th Cir. 1987); *United States v. Martinez*, 14 F.3d 543, 550 (11th Cir. 1994); *Khanani*, 502 F.3d at 1291–92; *Boyd v. Allen*, 592 F.3d 1274, 1305 (11th Cir. 2010).

Once the presumption of prejudice attaches, the plaintiff may rebut it by "show[ing] that the jurors' consideration of extrinsic evidence was harmless to the defendant."  *Boyd*, 592 F.3d at 1305.  "We consider the totality of the circumstances

surrounding the introduction of the extrinsic evidence to the jury," and the relevant factors "include: (1) the nature of the extrinsic evidence; (2) the manner in which the information reached the jury; (3) the factual findings in the trial court and the manner of the court's inquiry into the juror issues; and (4) the strength of the [plaintiff's] case." *Id.*

As mentioned, we assume without deciding that the presumption of prejudice attached in this case. Turning to whether the presumption was rebutted, our decision in *Ronda* illustrates why the contact between Bush and Juror 3 was harmless. In *Ronda*, we concluded that "the nature of the extrinsic evidence and the district court's thorough and careful response to that evidence convince[d] us that the presumption of prejudice ha[d] been clearly rebutted." 455 F.3d at 1300. We came to that conclusion because (1) a juror who did impermissible research did not convey any substantive information from that research to any other juror, (2) none of the jurors thought that a burglary that happened at another juror's house was "in any way related to the trial," (3) the district court instructed the jury to disregard the burglary entirely, and (4) the district court re-emphasized to the jury to stay impartial during deliberations. *Id.*

Similarly, in this case the contact between Bush and Juror 3 had no connection to the subject matter of the trial. None of the jurors, including Juror 3, felt that the incident affected their ability to be fair and impartial in any way. And the district court emphasized that the jury should disregard the incident and remain

fair and impartial to both sides.  On these facts, the presumption of prejudice has been rebutted.  *See id.*  The contact between Bush and Juror 3 was harmless.

Carollo's arguments to the contrary are meritless.  Carollo argues that he was prejudiced because (1) Bush had a vested interest in the outcome of the case, (2) Bush continued to appear at trial, and (3) Juror 3 remained and served as the foreperson of the jury instead of being dismissed.  As for Bush's interest in the outcome of the case, this argument again says nothing about the *effect* of Bush's contact with Juror 3 *on the jury*; it is irrelevant.  As for Carollo's argument about Bush's attendance at trial, the evidence he cites for that argument establishes only that Juror 3 had seen Bush at trial before her contact with him; not after.  And lastly, the cases Carollo cites to argue that Juror 3 should have been dismissed (rather than remaining and serving as foreperson) are materially distinguishable.  The dismissed jurors in the cited cases were either victims of a crime they ascribed to a particular party, *see id.* at 1297, or were actively disobeying the district court's instructions through their own conduct, *see United States v. Rowe*, 906 F.2d 654, 655–56 (11th Cir. 1990); *United States v. Gabay*, 923 F.2d 1536, 1542 (11th Cir. 1991).  Here, by contrast, Juror 3 made clear that although Bush's contact with her made her mildly uncomfortable, she was otherwise unfazed and ready to perform her duties.    Accordingly,   none   of   Carollo's   arguments

demonstrates an abuse of the district court's discretion in the handling of Juror 3.[6]

In sum, the district court properly responded to and investigated Juror 3's contact with Bush. And once it completed that investigation, the district court took appropriate measures to ensure the jury remained fair and impartial to both parties. Accordingly, Carollo fails to demonstrate an abuse of "the trial court's large discretion." *Ronda*, 455 F.3d at 1301. Thus, we affirm the denial of Carollo's motions for a mistrial premised on Bush's contact with Juror 3.

B.     *We do not have appellate jurisdiction to address Carollo's remaining issues on appeal*

Carollo seeks appellate review of the district court's denial of his motions for judgment as a matter of law, new trial, and remittitur. His lone notice of appeal in this case, however, did not give us jurisdiction over the district court's denial of those motions.

---

[6] Carollo also argues that the district court impermissibly barred him from discussing, during the presentation of evidence, how Bush purportedly harassed him during the underlying events of the case. Once again, this argument fails to demonstrate how or why Bush's contact with Juror 3 rendered any juror impartial. To the extent Carollo is making a standalone argument that the district court's exclusion of Bush-related evidence was error, Carollo offers no coherent argument as to why the district court in this case—which was about whether Carollo harassed Fuller and Pinilla—should have permitted the introduction of evidence about whether another person— who was neither a party nor a witness—harassed Carollo.

Federal Rule of Appellate Procedure 4 governs when and how a party may file a notice of appeal. As relevant to this case, Rule 4 provides that if a party timely moves in the district court "for judgment under Rule 50(b)," "to alter or amend the judgment under Rule 59," or "for a new trial under Rule 59," then the time to file an appeal does not begin to run until the district court enters "the order disposing of the last such remaining motion." Fed. R. App. P. 4(a)(4)(A)(i), (iv), (v). Nevertheless, a party may "file[] a notice of appeal after the [district] court announces or enters a judgment[] but before it disposes of" the listed motions. Fed. R. App. P. 4(a)(4)(B)(i); *see also Weatherly v. Ala. State Univ.*, 728 F.3d 1263, 1271 (11th Cir. 2013) ("[P]arties who file timely post-trial motions for relief under Federal Rules of Civil Procedure 50(b) and 59(b) are not required to wait until the district court provides a ruling on that motion before they appeal the final judgment."). When a party does so, his "notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered." Fed. R. App. P. 4(a)(4)(B)(i).

The Rule 4 provision that a party may appeal a judgment while his post-trial motions remain pending has an important caveat, however, in Rule 3. If a party appeals a final judgment before the disposition of his post-trial motions, and he also wishes to appeal the district court's subsequent disposition of his post-trial motions, then he "must file a [timely] notice of appeal, or an amended notice of appeal—in compliance with Rule 3(c)" designating that subsequent disposition for appeal. Fed. R. App. P.

4(a)(4)(B)(ii); *see also Parrish v. United States*, 145 S. Ct. 1664, 1675 (2025) ("Someone who wishes to appeal not only the original judgment, but also the substance of an order resolving the post-trial motion, must file a notice of appeal, or an amended notice of appeal, after the entry of the order disposing of that motion." (quotation omitted)); *Weatherly*, 728 F.3d at 1271 ("In order to seek appellate review of the district court's order on said motion, however, the appealing party *is* required to file a separate notice of appeal or amend its original notice to designate the motion as subject to appeal."). To comply with Rule 3(c), a notice of appeal must "designate an existent judgment or order, not one that is merely expected or that is, or should be, within the appellant's contemplation when the notice of appeal is filed." *Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 661 (11th Cir. 1998); *see also* Fed. R. App. P. 3(c)(1)(B) ("The notice of appeal must: . . . designate the judgment—or the appealable order—from which the appeal is taken . . . ."). If the party fails to file a notice of appeal that complies with Rules 3(c) and 4(a)(4)(B)(ii), then "we do not have jurisdiction to decide" whether the district court correctly ruled on the post-trial motions. *Weatherly*, 728 F.3d at 1272.

In this case, the district court entered final judgment on the jury's verdict on June 1, 2023. Carollo filed his post-trial motions for a new trial, remittitur, and judgment as a matter of law on June 28, 2023. The next day, Carollo appealed the already-entered final judgment. The district court did not deny Carollo's motions for new trial, remittitur, and judgment as a matter of law until

February 21, 2024.[7]  Under Rule 3(c), Carollo's notice of appeal did not suffice to appeal that denial order because the post-judgment denial order did not exist when the notice of appeal was filed.  *See Bogle*, 162 F.3d at 661.  Moreover, Carollo did not file a separate or amended notice of appeal from the denial order, and the time for Carollo to do so has expired.  *See* Fed. R. App. P. 4(a)(1)(A) (requiring a notice of appeal to be filed "within 30 days after entry of the judgment or order appealed from").  Because Carollo did not file any notice of appeal from the district court's denial of his post-trial motions that complied with Rule 3(c), Carollo also failed to comply with Rule 4(a)(4)(B)(ii), which requires "compliance with Rule 3(c)."  Fed. R. App. P. 4(a)(4)(B)(ii).  Accordingly, we do not have jurisdiction over Carollo's appeal from the district court's denial of his post-trial motions.  *Weatherly*, 728 F.3d at 1272, 1274.  Thus, we must dismiss the remainder of Carollo's appeal.  *See id.* at 1274.

---

[7] The district court denied Carollo's Rule 50(a) motion for judgment as a matter of law during the trial and prior to the entry of judgment.  But we are "deprive[d] . . . of the power to order the entry of judgment in favor" of a party unless the party renews its Rule 50(a) motion under Rule 50(b).  *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 401 (2006).  Accordingly, our review turns solely on whether Carollo properly appealed the denial of his Rule 50(b) motion, because we cannot grant relief on the denial of his Rule 50(a) motion alone.  *See id.*

### III.    Conclusion

For the foregoing reasons, we affirm the district court's denial of Carollo's motion for a mistrial and dismiss the remainder of Carollo's appeal for lack of appellate jurisdiction.

**AFFIRMED IN PART AND DISMISSED IN PART.**