**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Larry Lee TAYLOR, Randy Warren,**
**Hernando Tan De Castro,**
**Defendants–Appellants.**

No. 92–8688.

United States Court of Appeals,
Eleventh Circuit.

March 24, 1994.

Rehearing Denied May 11, 1994.

13. 591 F.2d at 1157.

Gregory E. Bennett, Savannah, GA, for defendant-appellant Randy Warren.

Frederick W. Kramer, III, Asst. U.S. Atty., Savannah, GA, for plaintiff-appellee U.S.

E. Pomeroy Williams, Bouhan, Williams & Levy, Savannah, GA, for defendant-appellant Hernando Tan De Castro.

Donald F. Samuel, Patrick J. Geheren, Garland & Samuel, P.C., Atlanta, GA, for defendant-appellant Larry Lee Taylor.

Before HATCHETT, Circuit Judge, FAY * and JOHNSON, Senior Circuit Judges.

* See Rule 34–2(b), Rules of the U.S. Court of    Appeals for the Eleventh Circuit.

JOHNSON, Senior Circuit Judge:

Defendants Hernan Castro, Larry Taylor, and Randy Warren appeal their convictions stemming from their participation in an international cocaine importation and distribution conspiracy. Additionally, Castro and Warren appeal their sentences. After due consideration, we affirm Castro's and Warren's convictions and sentences. Taylor's conviction is similarly affirmed.

## I. STATEMENT OF THE CASE

### A. *Factual Background*

This case stems from a two and one-half year government investigation into a worldwide cocaine conspiracy centering upon Junji Yamamoto, a Japanese national. Yamamoto, having been deported after serving a sentence for heroin distribution, maintained representatives in a number of cities to facilitate his drug trafficking activities. His San Francisco representative was Castro, and his representatives in Los Angeles were Carlos Chang and Victor Chavez.

Chang and Chavez regularly supplied cocaine to Taylor, with whom Chang had been incarcerated. Taylor, based in the Pacific Northwest, was a major distributor for Chang and Chavez, regularly distributing between twenty to sixty kilograms weekly. Every seven to ten days, Taylor would come to Los Angeles to deliver large sums of cash and to pick up cocaine. His representative, David Rhodes, would pick up cocaine from Chang and Chavez by driving to a pre-arranged location where he would leave the car. Chavez would then pick up the car, load it with cocaine, and return the car. Rhodes would then take the car and drive back north.

While in jail, Yamamoto met Mike Lowe. After being released from jail, Lowe was arrested for drug trafficking in West Virginia. In order to gain favorable treatment in those proceedings, Lowe contacted Special Agent Doug Driver of the federal Drug Enforcement Agency ("DEA") to offer him an "in" to Yamamoto.

Driver initiated an undercover operation and, using Lowe to make introductions, met Yamamoto in Jamaica on March 31, 1989.

While there, Driver offered to make a major purchase from Yamamoto, who instead offered a preliminary deal of fifteen kilograms of cocaine to be brought into El Paso, Texas, from Mexico. Driver refused this offer, and Yamamoto eventually agreed to a three hundred kilogram cocaine deal.

In November 1989, Lowe began serving a five-year sentence relating to his West Virginia case. Because of Lowe's sudden disappearance, Yamamoto suspected that he might have been working for the police. Nevertheless, Yamamoto, together with Betty Lara Arias, his Columbian connection, met Driver in December 1989 in Costa Rica, where they agreed on terms for an early 1990 cocaine delivery. With terms set, Yamamoto was anxious to speak with Lowe and began repeatedly calling his home. To alleviate Yamamoto's concern, Lowe's wife Lynn told Yamamoto that Lowe was in the hospital. However, Yamamoto nonetheless sent Castro to Lowe's residence to verify Lowe's illness. When Castro arrived at the airport, he spoke with Lynn, who convinced him that it would be futile to drive all the way out to the residence because Lowe was still in the hospital and Castro would miss his flight back to San Francisco due to the drive's length. Castro apparently believed Lynn, as he returned without seeing Lowe.

Upon Castro's return, Yamamoto called Lynn to arrange a meeting in Mexico with himself, Castro, the Lowes, and Driver. Driver refused the meeting. When Driver subsequently asked Yamamoto if a deal was going to happen, Yamamoto agreed to send other representatives, Chang and Chickelero, to meet with Driver in Savannah. On April 11, 1991, Chang and Chickelero arrived in Savannah from Los Angeles, bringing a one kilogram sample of ninety-two percent pure cocaine supplied by Chavez. Chang offered to front Driver twenty kilograms of cocaine at the same price Driver had negotiated with Yamamoto, with delivery to occur in ten days. Numerous delays ensued and the twenty kilograms were never actually delivered.

In May 1991, Chang told Driver of a multiton marijuana deal he was putting together

with Yamamoto and offered to front Driver fifteen kilograms of cocaine, with the sale proceeds being used to purchase a freighter in Panama for the venture. Chang arranged for Chickelero to deliver the fifteen kilograms, with Driver to pay Chickelero Five Thousand Dollars for expenses. On July 7, 1991, Chickelero delivered fifteen kilograms of ninety percent pure cocaine to Driver, representing it to be the property of both Chang and Chavez. Chickelero told Driver that Chavez wanted immediate payment. Driver refused and after speaking with Chavez by telephone, they agreed to stick to the payment terms originally set by Chang. After this conversation, Chickelero was arrested. He then agreed to cooperate with the DEA.

To shield his status as a DEA informant, Chickelero told Chavez that he would remain in Savannah until the fronted cocaine was sold and that he would then return with the money. Chang called Chickelero two days later, asking him to make deliveries of more cocaine. A week later, Chavez called, saying that Chang was in Guatemala and that Driver should deliver the money to him. Driver refused, saying that he would deliver the money only to Chang. They arranged for Driver and Chickelero to deliver the money to Chang in Los Angeles. At that delivery, Chang was arrested.

Chavez witnessed Chang's arrest but did not see Driver or Chickelero. Using this fortuitous circumstance, Driver instructed Chickelero to set up a meeting with Chavez to complete the money delivery aborted by Chang's arrest. Chavez told Driver and Chickelero that Taylor was coming to town and agreed to invite Taylor to the meeting. Chavez eventually met with Driver and Chickelero at a Los Angeles McDonald's. Although Taylor did not attend, Chavez confirmed that Taylor was in town to pay for sixty kilograms of cocaine. At the conclusion of the meeting, Chavez was arrested.

Minutes after his arrest, Chavez' beeper sounded, displaying the number for Taylor's mobile phone. Chickelero returned the call, claiming that Chavez had instructed him to mind his beeper, and set up a meeting with Taylor. At that meeting, Taylor was arrested with more than $200,000 and a pen coated with cocaine residue. One of the envelopes containing the cash was marked "Chang Export."

Aside from assisting in the arrest of Chang, Chavez, and Taylor, Chickelero also informed Driver that he had been selling cocaine to Warren. Originally, Warren bought small amounts from Chickelero. However, after Chickelero started working with Chang, Warren bought one kilogram of cocaine weekly via Federal Express.[1] Moreover, Chickelero even arranged a meeting between Chang and Warren to consider establishing a twenty-five kilogram stash in Dallas, from which Warren could draw in selling to his customers. At the time of his arrest, Warren owed $44,000 to Chang for cocaine fronted to him.

### B. Procedural History

On September 3, 1991, the Grand Jury for the Southern District of Georgia returned a superseding indictment charging Yamamoto, Chang, Castro, Lara Arias, Chavez, Taylor, Rhodes, and Warren with conspiracy to distribute and to possess with intent to distribute cocaine in the Southern District of Georgia, the Central District of California, Canada, Colombia, Costa Rica, Jamaica, and elsewhere. A second count charged Yamamoto, Chang, Castro, and Lara Arias with conspiracy to import cocaine into the United States.

Chang and Chavez pleaded guilty before trial. At the time of trial, Yamamoto and Lara Arias were fugitives, and Rhodes had been arrested on other drug charges in Wyoming, where he remained awaiting trial. After a five-day trial, Taylor, Castro and Warren ("Appellants") were found guilty of Count 1, and Castro was found guilty of Count 2. Their general strategy, which proved unsuccessful, was to admit to drug dealing but to deny any membership in the far reaching conspiracy alleged by the government. All three now appeal.

---

1. The cocaine was sent to a mail drop maintained by Warren in the name of Seaco International or by American Airlines counter-to-counter package service.

## II. ANALYSIS

The Appellants contend that a prejudicial variance existed between the evidence offered at trial and the indictment in that the indictment alleged a single conspiracy while the evidence proved several independent conspiracies. Additionally, Warren and Castro raise claims regarding the improper admission of evidence and challenge their sentences. Finally, Taylor claims that his conviction for conspiracy is invalid because of the admission of his prior conviction and the limiting of his cross-examination of Chickelero.

### A. *Multiple Conspiracies Claim*

The central argument advanced by Taylor, Castro, and Warren on appeal is that they were members of different conspiracies, rather than the single conspiracy charged in the indictment. This Court's review is narrow: "We may reverse a jury's finding that a single conspiracy existed only if the evidence, viewed in the light most favorable to the government, could not permit reasonable jurors to have found, beyond a reasonable doubt, that there was a single conspiracy." *United States v. Brito,* 721 F.2d 743, 747 (11th Cir.1983).

■ In determining whether the government has proven multiple conspiracies or a single conspiracy, this Court considers three criteria: (1) the existence of a common · goal, (2) the nature of the criminal scheme, and (3) the overlap of the participants in the various dealings of the conspiracy. *United States v. Adams,* 1 F.3d 1566, 1584 (11th Cir.1993); *United States v. Beale,* 921 F.2d 1412, 1423 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 100, 116 L.Ed.2d 71 (1991); *United States v. Caporale,* 806 F.2d 1487, 1500 (11th Cir.1986), *cert. denied,* 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679, *and cert. denied,* 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987). In finding a single conspiracy, there is no requirement that each

conspirator participated in every transaction, knew the other conspirators, or knew the details of each venture making up the conspiracy. *Blumenthal v. United States,* 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947); *Brito,* 721 F.2d at 746. "A single conspiracy may be found where there is a 'key man' who directs the illegal activities, while various combinations of other people exert individual efforts towards the common goal." *United States v. Gonzalez,* 940 F.2d 1413, 1422 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 910, 116 L.Ed.2d 810, *and cert. denied,* —— U.S. ——, 112 S.Ct. 1194, 117 L.Ed.2d 435 (1992) (citing *United States v. Stitzer,* 785 F.2d 1506, 1518 (11th Cir.), *cert. denied,* 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 44 (1986)).

■ Here, the jury was properly instructed on single versus multiple conspiracies and sufficient evidence exists that would support the jury's conclusion that the Appellants were involved in one conspiracy. Yamamoto, together with his Colombian connection Lara Arias, imported cocaine into the United States to supply his representatives—Castro in San Francisco, and Chang and Chavez in Los Angeles. In turn, Chang and Chavez sold cocaine on credit to both Taylor and Rhodes, using pre-arranged drop-off points. Likewise, Warren purchased cocaine from Chang and Chavez via Chickelero using similar methods. Accordingly, the conspirators shared the common goal of importing cocaine into the United States. See *Brito,* 721 F.2d at 747. Moreover, all three transactions have the common hub of Yamamoto at their core. See *United States v. Grassi,* 616 F.2d 1295, 1303 (5th Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980) (defendant, by working through common hub, can relate his activities to others);[2] *Stitzer,* 785 F.2d 1506 (single conspiracy where one source for five suppliers). In light of the above, the Appellants were properly convicted of a single conspiracy.[3]

---

**2.** This Circuit has adopted as precedent all former Fifth Circuit decisions rendered prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**3.** The Appellants also claim that the evidence is insufficient to support their convictions and that

venue was not proper in the Southern District of Georgia. These claims fail as we have already concluded that sufficient evidence exists supporting the existence of a single conspiracy of which overt acts (drug deliveries) occurred within the Southern District of Georgia.

### B. *Challenged Evidentiary Rulings*

The decision to admit or exclude evidence is committed to the sound discretion of the district court. *United States v. Norton*, 867 F.2d 1354, 1361 (11th Cir.), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701 *and cert. denied*, 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989). "On review, we will not disturb the trial court's evidentiary rulings unless the court has clearly abused its discretion in this area." *United States v. Champion*, 813 F.2d 1154, 1172 (11th Cir. 1987).

#### 1. Drugs in Warren's possession

■ When Warren was arrested, the government recovered several bags containing cocaine residue from his car, as well as eleven tablets of "ecstasy," an illegal drug that was not charged against him in the indictment. At trial, the government sought to introduce this evidence, but Warren objected, contending as he does again on appeal, that the drugs constituted evidence of bad acts that was inadmissible under Federal Rule of Evidence 404(b). The district court ruled the evidence admissible, reasoning that the drugs were evidence of Warren's participation in the charged conspiracy, and not simply evidence of Warren's bad acts.

The district court did not abuse its discretion in admitting the drug evidence because the evidence supported the government's case that Warren was a member of the conspiracy. *See United States v. Leavitt*, 878 F.2d 1329, 1339 (11th Cir.) (evidence needed to "complete the story of the charged offense" is admissible), *cert. denied*, 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989). At trial, the government introduced evidence that Warren had purchased five thousand pills of ecstasy and that Chickelero was brokering those pills for Warren. In addition, there was evidence that on a weekly basis, Warren was selling approximately one kilogram of cocaine that he acquired from Chang and Chavez via Chickelero.

#### 2. Statements made by Warren to co-conspirator

■ Warren claims that the district court erroneously admitted tape recordings of two cocaine-related conversations between himself and Chickelero occurring after Chickelero began acting as a government informant. According to Warren, the conversations were improperly admitted as they constitute nothing more than evidence of bad acts. Even if the conversations are admissible, Warren claims that they evidence a new conspiracy and are therefore irrelevant to the crime charged. Contrary to Warren's assertions, the conversations were properly admitted as their content raises an inference that the two men were engaged in a conspiracy prior to Chickelero's arrest. *United States v. Vasquez*, 874 F.2d 1515, 1517 (11th Cir.1989), *cert. denied*, 493 U.S. 1046, 110 S.Ct. 845, 107 L.Ed.2d 840 (1990).

### C. *Taylor's Prior Drug Conspiracy Conviction*

■ The admissibility of prior convictions evidence under Rule 404(b) is subject to a three-part test: (1) the evidence must be relevant to an issue other than the defendant's character, such as intent, motive, opportunity, or plan; (2) as part of the relevancy analysis, there must be sufficient evidence that a jury could find that the defendant committed the extrinsic act; and (3) the probative value of the evidence must not be substantially outweighed by its undue prejudice. *United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir.) (en banc) (citing *Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988)), *cert. denied*, — U.S. —, 113 S.Ct. 382, 121 L.Ed.2d 292 (1992). Further, where the defendant offers to stipulate to the issue the government seeks to prove, evidence of prior convictions is inadmissible. *United States v. Costa*, 947 F.2d 919, 925 (11th Cir.1991) (evidence of prior crime for purpose of proving intent rendered inadmissible by defendant's offer to stipulate to intent), *cert. denied*, — U.S. —, 112 S.Ct. 2289, 119 L.Ed.2d 213 *and cert. denied*, — U.S. —, 113 S.Ct. 360, 121 L.Ed.2d 272 (1992).

■ Taylor argues that because he offered to stipulate to intent, the first element of *Miller*'s three-part test is not satisfied, and thus the district court abused its discretion

by admitting evidence of Taylor's prior convictions. Taylor is incorrect for two reasons. First, the government sought to introduce evidence of Taylor's prior convictions to prove knowledge, motive, and absence of mistake or misapprehension, as well as intent. The prior convictions are admissible for these purposes. *United States v. Astling,* 733 F.2d 1446, 1456–58 (11th Cir.1984). Thus, Taylor's offer to stipulate to intent did not remove all the issues the government sought to prove. Second, the intent to which Taylor offered to stipulate was not the intent the government sought to prove: Taylor agreed to stipulate that he had the intent to buy and sell drugs; the government sought to prove Taylor intended to join a conspiracy. Accordingly, the district court did not abuse its discretion in admitting Taylor's prior conviction.

### D. *Statement that Castro Knew Yamamoto in Prison*

During the course of the government's presentation of the case, two witnesses testified that Castro had known Yamamoto in prison. First, Lynn Lowe testified, over Castro's objection, that she thought they had served time together. After Lowe finished testifying, Castro moved for a mistrial. The district court denied the motion, reasoning that the place where Castro and Yamamoto met was relevant and that it was likely to come out as 404(b) evidence. Second, DEA agent Boulad testified that Castro had told him he met Yamamoto in prison. Again Castro's attorney objected. The court sustained the objection, instructing the jury to disregard the testimony. After trial, Castro renewed his objection in the form of a motion for a new trial, which the district court denied.

■■■■ On appeal, Castro renews his objection, contending that the evidence's little probative value is greatly outweighed by the danger of prejudice. *See* Fed.R.Evid. 403. In response, the government asserts that the

evidence was necessary to explain the crime to the jury—without knowledge of Castro's imprisonment with Yamamoto, the jury would not understand why Yamamoto trusted Castro to approach Lowe. Where evidence of prior incarceration is used to demonstrate the government's theory of the case, that evidence is admissible. *See United States v. Lehder–Rivas,* 955 F.2d 1510, 1516 (11th Cir.) (evidence of prior incarcerations admissible when pertaining to conspirator's roles and motives), *cert. denied,* ─── U.S. ───, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992), *and cert. denied,* ─── U.S. ───, 113 S.Ct. 3063, 125 L.Ed.2d 745 (1993); *Champion,* 813 F.2d at 1172–73 (same). Further, even if this evidence was erroneously admitted, the substantial independent evidence of Castro's guilt reduces the likelihood that Castro's conviction substantially impacted upon the jury's verdict. *Champion,* 813 F.2d at 1173. Accordingly, the district court did not abuse its discretion in admitting evidence of Castro's prior incarceration.

### E. *Sentencing of Castro and Warren*

■■■■ On appeal, both Castro and Warren assail the district court's determination of the quantity of cocaine attributable to them for the purposes of sentencing. This Court reviews the district court's determination of the amount of cocaine involved in a conspiracy for clear error. *United States v. Alston,* 895 F.2d 1362, 1369 (11th Cir.1990). For sentencing purposes, a district court's factual determinations need be supported by only a preponderance of the evidence. *United States v. Louis,* 967 F.2d 1550, 1553 (11th Cir.1992).

In determining what quantity to use, the Sentencing Guidelines instruct the sentencing court to hold the defendant responsible for "all acts and omissions committed ... by [him], or for which [he] would be otherwise accountable, that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1) (Nov.1991).[4] Application Note 1 provides that in a conspiracy

---

4. That section has since been clarified by amendment: "the defendant is accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable

quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3(a), comment. (n. 2) (Nov. 1992).

case, "the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." *See United States v. Andrews*, 953 F.2d 1312, 1319 (11th Cir.) ("A sentencing court may thus hold a defendant responsible for all the reasonably foreseeable acts committed by other participants in the conspiracy."), *cert. denied*, —— U.S. ——, 112 S.Ct. 3007, 120 L.Ed.2d 882 *and cert. denied*, —— U.S. ——, 112 S.Ct. 3008, 120 L.Ed.2d 882 *and cert. denied*, —— U.S. ——, 112 S.Ct. 3048, 120 L.Ed.2d 915 (1992).

### 1. Castro

■ The district court found that Castro conspired to possess with the intent to distribute sixteen kilograms of cocaine—one kilogram delivered by Chang to Driver that came from Yamamoto and fifteen kilograms delivered by Chickelero to Driver that came from Chang and Chavez. On appeal, Castro maintains that he only played a "minor role" and that these quantities should not be attributed to him because they were not reasonably foreseeable by him. The district court's attribution of sixteen kilograms of cocaine to Castro was not clearly erroneous. Castro's role was essential to the delivery of the sixteen kilograms of cocaine because he was the person whom Yamamoto initially sent to meet with Lowe when Yamamoto was considering the possibility of dealing with Driver.

### 2. Warren

■ The district court found that Warren conspired to possess with the intent to distribute five kilograms of cocaine, basing its finding on evidence adduced at trial indicating that Warren had received one kilogram weekly for a period of at least six months. This finding is not clearly erroneous.

**5.** The Confrontation Clause of the Sixth Amendment provides:
"In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the

### F. *Taylor's Cross–Examination of Chickelero*

Taylor contends that the district court erred in limiting his cross-examination of Chickelero. In particular, Taylor's counsel attempted to impeach Chickelero's credibility with respect to Chickelero's testimony that his only concern at the trial was in telling the truth by demonstrating that Chickelero had lied in a civil proceeding after similarly stating that he would only tell the truth.

■ Generally, the district court's evidentiary rulings will be disturbed on appeal only where there appears a clear abuse of discretion. *United States v. Veltmann*, 6 F.3d 1483, 1491 (11th Cir.1993). The district court's discretion in limiting the scope of cross-examination is, however, subject to the requirements of the Sixth Amendment.[5] *United States v. Garcia*, 13 F.3d 1464, 1469 (11th Cir.1994); *United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir.1992). The importance of full cross-examination into possible bias increases where, as here, the witness is the star government witness or participated in the crimes for which the defendant is being prosecuted. *Haber v. Wainwright*, 756 F.2d 1520, 1522 (11th Cir.1985); *United States v. Barrentine*, 591 F.2d 1069, 1081 (5th Cir.) (citing *Beaudine v. United States*, 368 F.2d 417, 424 (5th Cir.1966)), *cert. denied*, 444 U.S. 990, 100 S.Ct. 521, 62 L.Ed.2d 419 (1979). However, once there is sufficient cross-examination to satisfy the Sixth Amendment's Confrontation Clause, further questioning is within the district court's discretion. *United States v. Garcia*, 13 F.3d 1464, 1469 (11th Cir.1994). "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *Id.*

■ Here, Taylor's counsel had ample opportunity to raise doubts regarding Chickelero's credibility. He extensively questioned Chickelero as to his plea agreement with the government in which he would plead

witnesses against him." U.S. Const., sixth amend.

guilty and assist the government in return for freedom from prosecution on any related federal charges. The jury also learned that Chickelero was awaiting sentencing on the guilty plea and that the sentencing judge would be apprised of Chickelero's cooperation with the government. In response to questions from Taylor's counsel, Chickelero admitted that he had a powerful motive to please the government in order to obtain a lesser sentence.[6] As for prior offenses, Taylor's counsel questioned Chickelero about his prior convictions for possession with intent to sell, forgery, and passing bad checks, as well as the fact that Chickelero had violated probation and cheated on his income taxes. As shown, the jury possessed extensive information from which to gauge Chickelero's credibility. Accordingly, the district court did not abuse its discretion in foreclosing Taylor's counsel from further questions pertaining to the civil proceeding. *See United States v. Haimowitz*, 706 F.2d 1549, 1558–59 (11th Cir.1983) (district court did not abuse its discretion in restricting defendant's ability to cross-examine witness regarding his executing fraudulent documents where jury had ample information regarding witness' credibility; jury knew witness was testifying under plea agreement, had eight prior criminal convictions, and was being paid by the government), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984).

## III. CONCLUSION

We AFFIRM TAYLOR's conviction. We likewise AFFIRM CASTRO's and WARREN's convictions and sentences.