[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 17, 2008
THOMAS K. KAHN
CLERK

No. 05-14492

_____

D.C. Docket No. 02-0011-CR-T-17MAP

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

versus

GENE A. TYRRELL,
DEAN A. SINIBALDI,
JOSEPH CUCINIELLO,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(March 17, 2008)**

Before EDMONDSON, Chief Judge, CARNES and FAY, Circuit Judges.

PER CURIAM:

Dean A. Sinibaldi ("Sinibaldi"), Joseph Cuciniello ("Cuciniello"), and Gene

A. Tyrrell ("Tyrrell"), were part of a conspiracy group which sold false and

unregistered security offerings through the Millenium and Stonehedge Groups and

caused great losses to many elderly individuals. Appellants were convicted on

specific charges of securities fraud, mail fraud, money laundering, selling of

unregistered securities, and conspiracy. Sinibaldi, Cuciniello, and Tyrrell raise

numerous issues[1] challenging evidentiary rulings, legal rulings, their convictions,

---

[1] The issues are:
1. Whether the district court abused its discretion in denying the defendants' motions for mistrial after the severance of the case against Schultz (Cuciniello's issue by adoption; Tyrrell's issue by adoption);
2. Whether the district court abused its discretion in allowing the admission of evidentiary rulings including: Miscellaneous Business Records, Abel Flores Reyes' Testimony, Albert Melchoir and expert witness Charles Stutts' testimony, Receiver Gary Lipson's testimony, and Sinibaldi's "RIA" certification status;
3. Whether the district court abused its discretion in declining to substitute juror Bennett with an alternate juror;
4. Whether the district court correctly denied Sinibaldi judgments of acquittal as to the mail fraud and other challenged counts of conviction;
5. Whether the district court correctly denied Sinibaldi a judgment of acquittal as to the conspiracy charged in count one;
6. Whether Sinibaldi was entitled to a new trial based on asserted cumulative error;
7. Whether the district court erred in calculating the loss attributable to Sinibaldi pursuant to U.S.S.G. § 2F1.1 (b)(1) (1998) or plainly err in ordering restitution in the amount of that loss;
8. Whether the district court correctly denied Cuciniello's motions of judgments of acquittal or a new trial;
9. Whether the district court abused its discretion in declining to dismiss the indictment based on alleged prosecutorial vindictiveness;
10. Whether Cuciniello's guidelines-range sentence was unreasonable;
11. Whether the district court correctly denied Tyrrell's motions for judgments of acquittal or a new trial; and
12. Whether the district court erred in failing to declare a mistrial as to all

2

and the sentences imposed.[2]  We affirm.

## Factual Background

Millennium Investment, Inc. ("MII") was created for the alleged purpose of helping new businesses become publicly traded companies.  Defendants Danny Wey ("Wey") and Gregory G. Schultz ("Schultz") served as officers and directors of MII.  Shortly thereafter, Millennium Investment, Inc. Trust ("MIIT") was created to market and sell unregistered notes.  The funds raised by MIIT were remitted to MII.  Schultz's duties included serving as legal counsel to the Millenium entities, drafting MIIT offering documents, and directing MIIT's fund-raising efforts.  Wey's duties included identifying the investments in which MIIT could place its funds.  Although Wey had a criminal background which included a federal conviction of felony fraud offenses, MIIT investors were not so advised despite MIIT disclosure documents with experience profiles for both Wey and Schultz.

Once MIIT commenced its operations, Schultz informed Wey that MIIT

---

defendants when defendant Schultz was severed midway through the trial.

[2] Sinibaldi was sentenced to a total of 168 months imprisonment, 36 months of supervised release, and restitution of $5,333,374.  Cuciniello was sentenced to total of 210 months' imprisonment, 36 months of supervised release, and restitution of $15,290,601.38.  Tyrrell was sentenced to 136 months imprisonment, 36 months supervised release, and restitution of $10,200,307.95.

notes which matured in less than nine months were exempt from state and federal registration requirements under the "commercial note exemption." Also, several of the notes MIIT issued included a "banker's acceptance" provision stating that the Bank of Bermuda Limited, which is one of the largest banks in the Carribean, would guarantee the notes in the event of default. As was ultimately discovered, this bank had never issued a "banker's acceptance" or any other guarantee to MIIT. In fact, neither the bank nor any of its subsidiaries had ever had a relationship with MIIT, its officials or entities.

Sinibaldi was the top seller at MIIT. For six months, he was involved in fifty-eight MIIT transactions, valued at $1,655,235.68, that purported to be secured by the banker's acceptance provision. He assured investors that MIIT notes were fully secured by the Bank of Bermuda and were a completely safe investment. At first, Sinibaldi received a commission of up to ten percent of any MIIT investments he secured, but in order to evade securities laws, Schultz determined that this compensation should be characterized as "consulting or advisory payments," even though Sinibaldi never offered any marketing or consulting services to the Millenium entities. Over a two year period, Sinibaldi and his company, Delta Financial Services, Inc., received a total of $465,234.47 in cash payments and additional securities from MII (which were sold for about

4

$85,000).  From October 1996 to July 1999, individuals invested more than $6 million in MIIT securities; however, by July 1999, MIIT had more than $1 million in past-due notes.  Furthermore, despite the fact that MIIT had defaulted on its obligations in October 1998, defendants falsely informed new investors that MIIT notes offered "good security."  By mid-1999, MIIT stopped raising funds.

Defendants then formed the Stonehedge entities.  Securities from these entities were marketed through individuals in the financial or insurance business, allegedly to provide funding to companies that were about to make public stock offerings.  The Stonehedge offering material stated that "Stonehedge invests their portfolio in a company called Millenium as its vehicle for making the investments." Stonehedge also advised investors that Millennium principals had over 40 years of experience in taking companies public.

From August 1998 to November 1999, Cuciniello incorporated eight Stonehedge entities in Florida.  Then in September and October 1999, despite being aware of an ongoing investigation of defendants' fraudulent activities by the Florida Department of Banking and Finance ("DBF"), Cuciniello incorporated another seven Stonehedge entities in New York.  Cuciniello served as an officer of several Stonehedge entities, was an authorized signator for ten Stonehedge-related bank accounts, and participated in seminars to train others to market Stonehedge

5

securities. Between March 1998 and April 2001, Cuciniello and his family received more than $850,000 from Stonehedge entities.

From March 1998 through November 2000, more than $12.5 million was invested in the Stonehedge offerings. Only about twenty percent of this money was invested as represented in the Stonehedge offering materials. However, up to thirty-three percent of these invested funds were paid out as commissions to those involved in the process.

In January 1998, Cuciniello brought co-defendant Robert Phillips ("Phillips") to the Stonehedge program. At a meeting held in Clearwater, Florida, Schultz provided further detail to Phillips about the program. Phillips then agreed to market the Stonehedge program through his network of insurance agents, West Coast Distributors, Inc. ("West Coast"). Out of every Stonehedge investment placed by Phillips's agents, West Coast would receive a commission of up to twenty-seven percent. In order to evade state and federal securities laws, Schultz told Phillips that these payments must be characterized as "referral fees" rather than "commissions."

In the fall of 1998, Phillips recruited Tyrrell to sell Stonehedge securities. After Tyrrell's involvement in the Stonehedge securities, the funds invested increased dramatically, from approximately $30,000 to $100,000 per month to as

much as $1,000,000 per month. His sales organization was the largest of all the sales organizations engaged in the Stonehedge marketing effort. Tyrrell participated in and created a training manual for seminars to train new agents to market Stonehedge securities. Also, Tyrrell was the president, secretary, treasurer, and sole shareholder of one of the entities–The Stonehedge Group, Inc.-X, and thus executed the shares of stock issued in connection with this entity.

From March through July 1999, DBF served investigative subpoenas for testimony and documents on MIIT, Sinibaldi, Global Research International, Inc., and many of the Stonehedge entities. Before responding to the subpoenas, defendants tried to conceal their fraudulent activities by supplementing MIIT investor files with backdated correspondence, and modifying and supplementing Stonehedge investor files to give them the appearance of conforming to applicable state and federal securities laws.

In October 1999, DBF filed a civil action in Pinellas County, Florida, seeking an injunction and appointment of a receiver for MII, MIIT, various Stonehedge entities, and First Dominion Venture Capital, Inc., and named as "relief defendants" Schultz, Wey, Cuciniello, and Sinibaldi. The state circuit court granted DBF's requests, entered an injunction, and appointed attorney Gary Lipson as receiver.

7

The defendants ceased using the Millennium and Florida based Stonehedge entities and turned all of their attention to the New York-based Stonehedge offerings. There they raised more than $3.2 million from November 1999 through November 2000. Despite the millions of dollars raised through the sale of these unregistered securities, Millenium investors lost more than $5.3 million and Stonehedge investors lost more than $11.4 million. Sinibaldi, Cuciniello, and Tyrrell invested none of their money in any of these entities.

After the state circuit court made its rulings, Cuciniello convinced Phillips that the injunction did not prevent him from marketing Stonehedge securities outside of Florida. Thereafter, the Stonehedge sales that Phillips and his agents made were processed through Tyrrell's Arizona-based company, Innovative Financial Concepts, LLC ("IFC"). About seven weeks after the injunction was entered, Phillips withdrew from the Stonehedge program.

Before Lipson's appointment, Tyrrell received his commissions from West Coast, through IFC. After the appointment, Tyrrell began to receive his commissions from the New York-based Stonehedge XII entity through another Arizona-based company recently registered by his wife–TMT Consulting. Payments to TMT Consulting were typically remitted to IFC.

The jury convicted Sinibaldi on the overarching conspiracy count, two

counts of securities fraud, three counts of selling unregistered securities, four counts of mail fraud, conspiracy to commit money laundering, eight counts of engaging in illegal monetary transactions, and seven counts of money laundering. Cuciniello was convicted on the overarching conspiracy count, one count of securities fraud, three counts of selling unregistered securities, eight counts of mail fraud, conspiracy to commit money laundering, seven counts of engaging in illegal monetary transactions, and seven counts of money laundering. Tyrrell was convicted on the overarching conspiracy count, one count of securities fraud, seven counts of mail fraud, conspiracy to commit money laundering, and seven counts of money laundering. This appeal followed.

## Discussion

I. *Defendants' Motions for Mistrial after Severance and Challenge to Standby Counsel*

Schultz originally represented himself *pro se*, but due to apparent health problems, he suffered a blackout and collapsed in court. Because of Schultz's illness and admittance to a hospital, the court appointed stand-by counsel on his behalf. The court explained this change to the jury. On March 16, 2005, because Schultz continued to suffer tremendous pain and had difficulty concentrating, the district court severed his case and granted him a mistrial.

Appellants first challenge their motion for a mistrial based upon the severance of Schultz from the remainder of the trial. The basis of this argument was the prejudicial effect of the jury's observation of Schultz's apparent health problems. Sinibaldi also challenges the district court's appointment of standby counsel for Schultz. After a thorough review of the record, we conclude that none of these arguments provide any basis for relief.

We review a district court's denial of a severance for abuse of discretion. *See U.S. v. Day*, 405 F.3d 1293, 1297 n. 3 (11th Cir. 2005). First, the district court was correct in initially denying a severance because "the general rule is that defendants who are jointly indicted should be tried together, particularly in conspiracy cases." *U.S. v. Baker*, 432 F.3d 1189, 1236 (11th Cir. 2005) (citing *U.S. v. Pedrick*, 181 F.3d 1264, 1272 (11th Cir. 1999)). Next, Sinibaldi has no standing to challenge the district court's appointment of Schultz's standby counsel, only Schultz has such standing. The jury observed Schultz's health problems before the appointment of counsel and the court properly explained the appointment to them. The jury was fully instructed to draw no inferences from such. Thus, Sinibaldi's arguments that the jury would have interpreted the appointment as an indication of guilt is without merit and there was no abuse of discretion. Sinibaldi also argues that Schultz's ultimate severance from the trial

deprived the remaining defendants of Schultz's assistance in their joint defense. We find this argument frivolous. Schultz was available as a witness, but was never called by anyone.

Sinibaldi argues that the defendants were prejudiced because evidence of events in which only Schultz had been involved was introduced at trial. Because this case involves a conspiracy, all defendants involved in the conspiracy are liable for the reasonably foreseeable consequences of the conspiracy including the acts of co-conspirators. *See U.S. v. Silvestri*, 409 F.3d 1311, 1335 (11th Cir. 2005); *U.S. v. Alas*, 196 F.3d 1250, 1251 (11th Cir. 1999); *U.S. v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir. 1996) ("Hence, a court need not assess the individual culpability of a particular conspirator provided the substantive crime was a reasonably foreseeable consequence of the conspiracy.") (internal quotation marks omitted). The trial court gave the jury clear detailed instructions designed to eliminate any confusion of "prejudicial spillover." The jury was carefully instructed to consider each defendant separately as to each count in the indictment. There was no error.

II. *Defendants' Challenge to the District Court's Evidentiary Rulings*

We review the district court's evidentiary rulings for abuse of discretion.

*See U.S. v. Lyons*, 403 F.3d 1248, 1250 (11th Cir. 2005).

A. *Miscellaneous Business Records*

The documents at issue are GX 115-1A– (a copy of the outside cover of a MIIT file concerning investor Jack Overmire), GXs 112G, 115-1-G– (exhibits containing investor correspondence), and GX 35– (past-due MIIT notes pertaining to several investors). According to Wey's testimony, these and a series of other MIIT documents had been created and maintained by the defendants in the ordinary course of their business. Thus because "a trial judge has broad discretion to determine the admissibility of [business record] evidence[,]" the court properly admitted these documents as business records pursuant to Fed. R. Evid. 803(6). *U.S. v. Bueno-Sierra*, 99 F.3d 375, 378 (11th Cir. 1996). These business records do not violate the Confrontation Clause because none of them are testimonial.[3]

B. *Abel Flores Reyes' Testimony*

Sinibaldi argues that the district court abused its discretion by allowing the former mayor of San Lorenzo, Nicaragua, Abel Flores Reyes, to testify over the defendants' objections, regarding a conversation he had before executing an agreement which purported to establish a business relationship between the

---

[3] A record would be testimonial if it was "made under circumstances which would lead the declarant to believe the statement would be available for use at a later trial." *U.S. v. Underwood*, 446 F.3d 1340, 1347 (11th Cir. 2006).

government of San Lorenzo and the Millennium and Stonehedge entities. Reyes stated that during this conversation, Claudia Garcia told him that attorneys in Miami, Florida, would provide money to build housing for the impoverished in San Lorenzo if he would execute the agreement at issue. According to Sinibaldi, this testimony was inadmissible hearsay and a violation of the Confrontation Clause. We disagree. Reyes' testimony established that no business relationship existed between the government of San Lorenzo and the Millennium and Stonehedge entities. Furthermore, Reyes' testimony about the conversation that prompted him to execute the agreement explained why Reyes had signed it. This challenged testimony was not offered to prove the truth of any matter asserted and therefore it is not hearsay under Fed. R. Evid. 801(c). *See Cargill v. Turpin*, 120 F.3d 1366, 1373 n.15 (11th Cir. 1997) ("Hearsay is an out-of-court statement offered to prove the truth of the matter asserted," but evidence that is not offered or admitted for its truth is not hearsay) (internal quotation marks omitted). Rather, it was offered to show his mental state and why he signed the document.

C. *The testimony of Albert Melchoir and Expert Witness Charles Stutts*

Sinibaldi further argues that the district court abused its discretion in allowing Albert Melchoir, an Assistant General Counsel for the State of Florida Office of Financial Regulation, who was primarily responsible for dealing in cases

involving securities, to answer questions advanced by Schultz on cross-examination in an "over responsive" manner. Melchoir explained why DBF had sought *ex parte* injunctive relief in October 1999. He stated that as a result of his investigation, he "was certain that Stonehedge had raised about $3 million and were continuing to sell unregistered securities through unregistered agents." The defendants have never disputed that the Stonehedge offerings were unregistered. They had always maintained that they were exempt from registration.

Sinibaldi next argues that Charles Stutts, the United States' securities expert, gave impermissible legal opinions during his testimony. The record convinces us that the district court properly limited the scope of Stutt's testimony, gave the jury appropriate limiting instructions, instructed the jury on applicable securities law, explained the role of an expert witness, and committed no error.

## D. *The Testimony of Receiver Gary Lipson*

Sinibaldi argues that the district court abused its discretion by allowing Gary Lipson, the receiver appointed by DBF, to make "improper commentary," citing comments from Lipson's four days of trial testimony. The district court properly sustained the defendant's objection and instructed the jury to disregard the

"improper commentary"[4] the defendant objected to. We assume they did.

### E. *Sinibaldi's "RIA" Certification Status*

Sinibaldi argues that the district court should have excluded as propensity evidence a 1998 Lee County yellow pages advertisement, a 1999 brochure advertising an estate planning seminar, and a business card, in which he falsely held himself out to the public as a registered investment advisor or "RIA." Sinibaldi argues this evidence is inadmissible under Fed. R. Evid. 404(b). However, this evidence demonstrated how Sinibaldi had conducted his fraudulent marketing activities during the charged conspiracies. Furthermore, this evidence was "inextricably intertwined with the evidence of the charged offense[s]," *U.S. v. Herre*, 930 F.2d 836, 837 (11th Cir. 1991), and thus Rule 404(b) does not apply. *See U.S. v. Schlei*, 122 F.3d 944, 989-90 (11th Cir. 1997) (concluding that testimony of defendant's unauthorized use of embassy letterhead to market forged financial instruments was "admissible as intrinsic evidence" of the charged scheme to defraud). Even though none of the Government's witnesses indicated that they had placed particular reliance on this specific misrepresentation in deciding

---

[4] During Lipson's cross-examination about a document he had recovered from the defendants, Cuciniello's counsel displayed a portion of the first page of the document on the court's projection system. After some heated questions regarding sections of the document, Lipson made the challenged statement "You're afraid to show the whole page, aren't you?"

whether to invest in MIIT notes, this intrinsic evidence remains relevant and admissible. Specific reliance is not required under the federal fraud statutes. *See Neder v. U.S.*, 527 U.S. 1, 24-25, 119 S.Ct. 1827, 1841 (1999). A scheme to defraud must include a material misrepresentation, that is, "one having a natural tendency to influence, or capable of influencing, the decision maker to whom it is addressed." *U.S. v. Hasson*, 333 F.3d 1264, 1271 (11th Cir. 2003), *cert. denied*, 541 U.S. 1056 (2004). Sinibaldi misrepresented that he was a registered RIA, when in actuality, he did not even have a high school diploma. This misrepresentation gave the false impression that he possessed a high level of professional expertise and experience capable of influencing potential investors.

III. *Whether the District Court Erred in Declining to Substitute Juror Bennet*

Sinibaldi argues that the district court abused its discretion in declining to substitute an alternate for juror Bennett. Under Fed. R. Crim. P. 24(c), "a trial court may, in the exercise of its sound discretion, substitute an alternate juror for a regular juror who has become unable or disqualified to perform h[er] duties." *U.S. v. Holder*, 652 F.2d 449, 451 (5th Cir. Unit B Aug. 1981).[5]

---

[5] *See Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent in the Eleventh Circuit, all decisions of the former Fifth Circuit announced prior to October 1, 1981).

16

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Remmer v. U.S.*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). "A juror's exposure to extraneous material or influence requires a new trial if the exposure poses a reasonable possibility of prejudice to the defendant." *U.S. v. Khanani*, 502 F.3d 1281, 1291 (11th Cir. 2007) (internal quotations marks omitted). To make a such a showing, "a defendant must establish that an extrinsic contact with a jury, in fact, occurred." *Id.* Once this showing is made, "the burden shifts to the government to prove that the extrinsic contact was not prejudicial." *Id.* "The factual determination of whether consideration of extrinsic evidence caused the defendant prejudice is committed to the trial court's 'large discretion.'" *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1472 (11th Cir. 1992). It must be noted that even though the juror states in her testimony "that the extrinsic information was harmless, [it] is not controlling." *U.S. v. Bolinger*, 837 F.2d 436, 440 (11th Cir. 1988). "The district court may consider such testimony, but it must also consider other factors such as the nature of the extrinsic evidence and the strength of the evidence properly presented by the government against the defendant." *Id.* (quoting *U.S. v. Chastin*, 198 F.3d 1338, 1351 (11th

17

Cir. 1999)).

Juror Bennett's concern was a result of the lunch break on March 8, 2005. Jurors Williams, Glandt, and Bennett were sitting at a table eating when the defense attorneys arrived and sat at the table next to them. One of the lawyer's chair rubbed against the back of juror Bennett's chair. The jurors then quickly finished their lunch and returned to the courthouse. Immediately thereafter, the court informed the defense that juror Williams had told the bailiff that she had a concern about members of the defense who sat near her during the lunch break. During *voir dire*, the district court properly questioned whether any of the jurors had overheard anything said by the attorneys or anyone else at their table in the restaurant. They all responded in the negative. The court then prohibited the parties, counsel, and witnesses from eating lunch in a portion of the area surrounding the courthouse and separated them from the jury.

The next day, juror Bennett addressed the district court stating that she did not hear what the attorneys were talking about in the restaurant. The jurors were already eating when the defense attorneys chose to sit next to them. She further stated that her stress was because she had been instructed that jurors were not supposed to be close to the attorneys on the case and that the attorneys in the restaurant were "too close for comfort." She had the utmost respect for the court

18

and wanted "to do the right thing" for everyone by reporting what had happened. Juror Bennett further explained that she was stressed due to physical exhaustion from commuting to and from the courthouse and performing her regular job responsibilities after trial each day. Consequently, the court accommodated her by allowing her to stay in a Tampa hotel any night she wanted to rest. The court then assured juror Bennett that the restaurant incident would not be repeated, and that if in the future she felt that she could not continue with her demands as a juror, she should immediately tell the court. Juror Bennett affirmed that she felt better about the situation. We believe these measures immediately resolved the situation. Based on the foregoing, the district court committed no error by allowing juror Bennett to remain on the panel.

IV. *Defendants' Motion for Acquittal on Mail Fraud and Other Challenged Counts of Conviction*

We review *de novo* the district court's denial of a motion for judgment of acquittal and view the evidence in the light most favorable to the verdict. *U.S. v. Byrd*, 403 F.3d 1278, 1288 (11th Cir. 2005). "A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of evidence." *Id.*

"To prove mail fraud, the Government must show that the defendant (1)

intentionally participated in a scheme to defraud and (2) used the mails to execute the fraudulent scheme." *U.S. v. Suba*, 132 F.3d 662, 673 (11th Cir. 1998). "The Government must establish only that the fraudulent scheme existed" and circumstantial evidence of criminal intent can be sufficient. *Id.* Furthermore, "[p]roof of a routine practice of using the mail to accomplish a business end is sufficient to support a jury's determination that mailing occurred in a particular instance." *U.S. v. Waymer*, 55 F.3d 564, 571 (11th Cir. 1995).

We find that there is sufficient evidence to prove use of the mails as to mail fraud counts ten and twelve on which Sinibaldi was convicted. These two counts concern MIIT investor Bernard Freund ("Freund"). Robert Freund, Freund's grandson, testified that the election form included with the letter that is the subject of count ten had been completed by Freund, and also both that letter and the letter that is the subject of count twelve had Freund's home address at the time. The form and substance of these letters is sufficient evidence to support the inference that they were mailed. Furthermore, there is evidence that Millennium entities typically had communicated with investors through the mail.[6]

---

[6] Sinibaldi testified in a sworn statement that the Millenium entities' "standard procedure" was to send documents to and receive documents from investors through mail. Also, Dan Wey testified that the Millenium entities typically had communicated with investors through mail. Furthermore, numerous investors testified that the Millenium entities had communicated with them through mail.

Sinibaldi further argues that the Government did not prove numerous overt acts alleged in count one concerning the investment returns Sinibaldi falsely had advised Millennium investors they could anticipate. However, for a defendant to be convicted of a conspiracy to defraud pursuant to 18 U.S.C. § 371, the government was only required to prove "an" overt act, not every overt act alleged. *See U.S. v. Ellington*, 348 F.3d 984, 989 (11th Cir. 2003). There is direct evidence of overt acts alleged in the paragraphs Sinibaldi is not now challenging. The record also discloses circumstantial evidence supporting the overt acts in question. The testimony of several investors made clear that Sinibaldi had falsely represented that their MIIT notes would produce a twelve percent profit plus a five percent bonus. This argument fails.

V. *Defendants' Motion for Acquittal on the Conspiracy Charged in Count One*

This Court narrowly reviews an argument that the evidence failed to prove a single, overarching conspiracy and "may reverse a jury's finding that a single conspiracy existed only if the evidence, viewed in the light most favorable to the verdict, could not permit reasonable jurors to have found, beyond a reasonable doubt, that there was a single conspiracy." *U.S. v. Anderson*, 326 F. 3d 1319, 1327 (11th Cir. 2003) (quoting *U.S. v. Taylor*, 17 F.3d 333, 337 (11th Cir. 1994).

Sinibaldi argues that Millenium and Stonehedge offerings evidenced two separate conspiracies, rather than a single, overarching conspiracy. "Three relevant factors determine whether a single conspiracy existed: (1) whether there was a common goal, (2) the nature of the scheme, and (3) the overlap of the participants." *Id*. "If the proof shows the defendant knew the essential objective of the conspiracy, it does not matter that he did not know all its details or played a very minor role in the overall scheme." *Suba*, 132 F.3d at 672. Furthermore, "[a] single conspiracy may be found where there is a 'key man' who directs the illegal activities, while various combinations of other people exert individual efforts toward the common goal." *Taylor*, 17 F.3d at 337 (quoting *U.S. v. Gonzalez*, 940 F.2d 1413, 1422 (11th Cir. 1991).

All of these factors are satisfied here. Among other things, the defendants marketed an array of Millennium and Stonehedge offerings, whose common goal was raising funds through the sale of unregistered securities that allegedly would pay interest or other periodic monetary distributions. Furthermore, examples of overlapping included the "Due-Diligence Worksheet" provided to Stonehedge investors, which portrayed MIIT and Schultz as responsible for "help[ing] selected companies go public" and Phillips, Tyrrell, and their respective companies, as responsible for marketing the Stonehedge offerings. Finally, the district court

22

properly instructed the jury on single versus multiple conspiracies. There is ample support for the jury's finding that Millenium and Stonehedge offerings were part of a single, unified conspiracy.

## VI. *Defendant's Claim of a Cumulative Effect of Errors*

We review any errors preserved for appeal, as well as any plain errors, to determine whether the defendant's substantial rights were affected. *See U.S. v. Adams*, 74 F.3d 1093, 1099-1100 (11th Cir. 1996). Sinibaldi argues that the "cumulative effect" of the errors he has alleged on appeal warrants a new trial. "We have held that the cumulative effect of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible." *U.S. v. Thomas*, 62 F.3d 1332, 1343 (11th Cir. 1995) (internal quotation marks omitted). As discussed above, the district court did not err as Sinibaldi contends; therefore, no cumulative errors exist. *See U.S. v. Waldon*, 363 F.3d 1103, 1110 (11th Cir. 2004).

## VII. *Whether the District Court Erred in its Calculation of Loss Pursuant to U.S.S.G. §2 F1.1(b)(1)*

Sinibaldi contends that the district court erred in its calculation of the $5,333,374 loss attributed to him and its order of restitution of the same amount. We agree with the district court in holding Sinibaldi responsible for all of the

23

losses attributed to the conspiracy. *See U.S. v. Odom*, 252 F.3d 1289, 1299 (11th Cir. 2001) (explaining that in calculating restitution, "a defendant convicted of participation in a conspiracy is liable not only for her own acts, but also those reasonably foreseeable acts of others committed in furtherance of the conspiracy."); *U.S. v. Dabbs,*, 134 F.3d 1071, 1081 (11th Cir. 1998) ("The calculation of loss for purposes of section 2F1.1 is not an exact science. [Under U.S.S.G. §2F1.1 cmt., n.8 (1994)] The loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.")[7]. The evidence supports the calculation made in this regard and, indeed the sum could have been much larger.

### VIII. *Cuciniello's Motions for Judgments of Acquittal or a New Trial*

Cuciniello specifically argues that at the close of the evidence in the Government's case-in-chief, prosecutors had failed to establish ill will, or criminal intent on the part of Appellant. This argument is without merit. "The Government need not produce direct proof of scienter in a mail fraud case . . . circumstantial evidence of criminal intent can suffice." *U.S. v. Hawkins*, 905 F.2d 1489, 1496 (11th Cir. 1990). In fact, "[g]uilty knowledge can rarely be established by direct

---

[7] We note that § 2F1.1 has been rolled into § 2B1.1 effective November 1, 2001; however, that change does not affect our discussion of the claims being made in this case.

evidence, especially in respect to fraud crimes which, by their very nature, often yield little in the way of direct proof." *Suba*, 132 F.3d at 673. Among other things, Cuciniello incorporated eight of the sixteen Stonehedge entities, was an officer in many of these entities, including being President of the Stonehege Group, Inc., was an authorized signator for ten separate Stonehedge-related bank accounts, was a cardholder of two Stonehedge-related American Express accounts, recruited co-defendant Robert Phillips into the defendants' scheme providing him with guidance after DBF initiated its investigation into the defendants' Florida-based operations, and profitted from the sale of MIIT securities without ever investing his own money into any securities. Because the evidence established that Cuciniello actively participated in the organization and operation of the defendants' fraudulent investment scheme, the district court was correct in denying Cuciniello's motions for judgments of acquittal or a new trial.

IX. *Defendants' Motion to Dismiss Based on Prosecutorial Vindictiveness*

We review the district court's denial of a motion to dismiss an indictment based on alleged prosecutorial vindictiveness for abuse of discretion. *See U.S. v. Barner*, 441 F.3d 1310, 1315 (11th Cir. 2006). In May 2001, the United States sent Cuciniello and his co-defendants letters informing them that they were targets of a

25

pending grand jury investigation. On October 29, 2002, Schultz began a civil class action lawsuit seeking more than $300,000,000 in damages against several of the state and federal agencies and individuals involved in the investigation of the defendants' fraudulent investment scheme, including one of the federal prosecutors assigned to handle this case. Then, on December 10, 2002, the grand jury returned a superseding indictment, adding charges and defendants, including Cuciniello, to the existing indictment. Cuciniello then filed a motion to dismiss the indictment for prosecutorial vindictiveness because the United States had allegedly sought the superseding indictment in retaliation for the civil action Schultz had filed. Because "[a]s a general rule, the courts are not free to interfere with the prosecuting officer's discretionary decision to prosecute crime," *U.S. v. Spence*, 719 F.2d 358, 361 (11th Cir. 1983), and because it is clear in the record that the grand jury investigation that resulted in the indictment in this case was begun before Schultz filed his class action lawsuit, *see U.S. v. Corona*, 849 F.2d 562, 567-68 (11th Cir. 1988) (prosecutorial vindictiveness claim fails when government's investigation preceded defendant's exercise of procedural rights), there is no evidence of prosecutorial vindictiveness.

X. *Cuciniello's challenge to the guidelines-range sentence*

"We review the length of a sentence for reasonableness in light of the facts

26

and circumstances of the defendant's case reflecting the sentencing considerations in [18 U.S.C.] § 3553(a)." *U.S. v. Williams*, 456 F.3d 1353, 1363 (11th Cir. 2006); *see U.S. v. Thomas*, 446 F.3d 1348, 1351 (11th Cir. 2006). This review for reasonableness is deferential and the weight accorded to any § 3553(a) factor is up to the discretion of the district court. *Williams*, 456 F.3d at 1363. Cuciniello argues that the massive sentence imposed by the district court was not necessary. The party who challenges the sentence has both the burden of showing that the sentence is unreasonable and the initial burden of establishing that the district court considered an impermissible factor at sentencing. *See id.* at 1361. When reviewing a sentence for reasonableness, this Court must evaluate whether the sentence achieves the purposes of sentencing set out in 18 U.S.C. § 3553 (a)(2)(B) & (C). *Id.* Here, Cuciniello has not identified a section 3553 factor that would support a lesser sentence. Furthermore, because among other things, Cuciniello violated the terms of his pretrial supervised release by attempting to market another investment scheme while on pretrial release, and after a review of the entire record, Cuciniello's 210-month sentence was not unreasonable. The sentence was required to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553 (a)(2)(B) & (C).

27

XI. *Arguments waived because they were not properly raised-and supported-in Cuciniello's brief*

Cuciniello concludes his brief as follows: "Cuciniello reasserts here any and all objections made at trial, including, but not limited to the basis for his mistrial, severance, and new trial motions, as stated at the district court level." Because Cuciniello has failed to identify and support these putative arguments in his brief (other than by incorporating by reference the entire record in this case), he has waived them. *See Kelliher v. Veneman*, 313 F.3d 1270, 1274 n.3 (11th Cir. 2002).

XII. *Tyrrell's Motions for Judgments of Acquittal or a New Trial*

We review the district court's denial of a Motion for Judgment of Acquittal *de novo*. *See U.S. v. Hansen*, 262 F.3d 1217 (11th Cir. 2001). We review the district court's denial of a Motion for a New Trial for abuse of discretion. *See U.S. v. Ward*, 274 F.3d 1320 (11th Cir. 2001). Tyrrell argues that his Motion for Acquittal "was premised on the Government's failure to prove scienter in support of the various conspiracy claims raised against him." Tyrrell also argues that "[t]he evidence adduced at Trial did not include any direct or circumstantial evidence of Mr. Tyrrell's knowing participation in an agreement to defraud." Because an abundance of evidence adduced at trial proved Tyrrell's knowing and voluntary

participation in the charged conspiracies and because the existence of a conspiracy may be proven by circumstantial evidence, *see U.S. v. Guerra*, 293 F.3d 1279, 1285 (11th Cir. 2002), we hold that the district court correctly denied Tyrrell's motions for judgments of acquittal or, in the alternative, for a new trial.

## Conclusion

For the foregoing reasons, the challenged convictions and sentences are **AFFIRMED.**